Dorothy J. ALCORN, John Ettling, Debbie Hanna, James H. Jones, C.F. Kendall II, James L. Ketelsen, Kenneth L. Lay, Xavier C. Lemond, Amos C. Miller, Jose Molina, James H. Pickering, R.E. Reamer, Don A. Sanders, Loyd S. Swenson, Jr., Stanley E. Siegel, James A. Tinsley, Richard L. Van Horn, and Sally N. Vaughn, Appellants,

v.

Fabian VAKSMAN, Appellee.

No. 01–91–01406–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 12, 1994.

Rehearing Denied June 23, 1994.

392

Dan Morales, Will Pryor, Mary F. Keller, Jorge Vega, David W. Williams, Austin, for appellants.

David T. Lopez, Houston, for appellee.

Before OLIVER–PARROTT, C.J., and DUGGAN, O'CONNOR, WILSON, HEDGES and ANDELL, JJ., en banc.

## OPINION EN BANC

COHEN, Justice.

The appellants and the appellee have filed motions for rehearing. We overrule the motions, withdraw our previous opinion, and issue this one in its place.

The appellee, Fabian Vaksman, sued the appellants, who are members of the board of regents of the University of Houston, the president of the University, and the dean, department chair, and members of the graduate committee that expelled him, for damages he alleged resulted from his dismissal from the University's doctoral program in history. Vaksman sued the regents and the president of the University in their official capacities, and the dean, department chair, and members of the graduate committee both individually and in their official capacities.

Trial was to the bench. The court found for Vaksman, awarded him actual damages and attorney's fees, and ordered that he be reinstated to the doctoral program.

The primary issues presented are whether state officers held liable only in their official capacities are protected by sovereign immunity from an award of money damages; whether legislative consent is required to sue the State for relief other than money damages for denial of state constitutional rights; whether legislative consent is needed to sue the State for money damages for breach of contract; and whether the evidence supports the trial judge's findings that Vaksman's expulsion was motivated by bad faith and ill will and violated his rights under the Texas Constitution to due process and freedom of speech. We hold that (1) state officers held liable only in their official capacities are immune from an award of money damages; (2) legislative consent is not required to sue state officials for nonmonetary relief for violation of state constitutional rights; (3) legislative consent is required to sue the State for monetary damages for breach of contract; and (4) the evidence supports the judge's findings.

## Fact Summary

Vaksman emigrated to the United States from Russia. He attended New York University, where he was awarded a master's degree in history. In 1982, he entered the University of Houston's doctoral program in American history. The program was taught by the University's history department, which was chaired by Professor John Ettling.

By 1984, Vaksman had completed all of the preliminary requirements for his doctorate, including course work, teaching assignments, and a comprehensive oral examination. He thus attained "ABD" status, signifying that he had completed the requirements for a doctorate "all but dissertation." Two professors were assigned to be Vaksman's dissertation advisors. Upon their resignation, Professor Clifford Egan was assigned. Vaksman was dismissed from the program in 1986.

Between his entering the program and his dismissal, Vaksman was outspoken about university policies and current political issues. He expressed his views in newspapers, both in articles and in letters to the editor. He appeared on radio talk shows, gave lectures, and spoke at seminars. Vaksman's targets included the Soviet Union, the History Department at the University of Houston, and the Athletic Department at the University. Examples of his outspokenness include the following:

* Vaksman criticized the Soviet Union's government as, among other things, oppressive.

* He criticized the expenditure of public funds by the Athletic Department, arguing

that the funds would be better spent on academic pursuits.

* He alleged that the University improperly provided funds to students who had full-time jobs and to a student who was assisting the chancellor's wife in editing her dissertation thesis.

* He provoked a legislative inquiry into the allegedly improper use of funds by the University, and, specifically, by the History Department.

* He criticized apartheid-inspired United States sanctions against South Africa, writing that the sanctions should be ended because they were so weakening South Africa that Russia could get a foothold there, making the choice "apartheid or the KGB."

* He criticized the University for not maintaining a separate graduate faculty, arguing that a single faculty for both undergraduate and graduate students decreased the quality of the students' education.

* He criticized members of the History Department for allegedly violating the University's no-smoking policy.

* He criticized the University for not hiring more minority faculty members.

* He wrote a book, *Ideological Struggle,* that criticized the internal politics of the Soviet Union. The book was ultimately published and was criticized by some members of the History Department.

In 1986, Vaksman asked the graduate committee to allow him to change fields from American history to European history, provided that he could pass an oral examination in European history, and then to allow him to submit *Ideological Struggle* as his dissertation. The committee met in October to consider Vaksman's requests and also to consider Vaksman's appointment as a teaching or research assistant.

On October 28, 1986, the committee unanimously voted to dismiss Vaksman. Neither Professor Egan nor Vaksman had been notified that the committee was considering dismissing Vaksman.

Vaksman was notified of his dismissal by hand delivery of a letter the next day. The letter was signed by Professor James Jones, as coordinator of graduate studies, and stated as follows:

The Graduate Committee (all members present) met on October 28, 1986 to consider your request that you be permitted to change your major field of graduate study from American history to European history, with a concentration on Russian/Soviet history. As you know this was the second time this fall that the Graduate Committee has held a special meeting to consider a request by you, the first meeting occurring earlier this month to review your renewed request for financial assistance.

These two meetings have given the Graduate Committee an opportunity to review your progress and performance to date in the Ph.D. program. We have been deeply troubled by what we have learned from this review, for your graduate record reveals a pattern of academic problems that in our judgment cannot be ignored.

I regret to inform you that the Graduate Committee, after discussing your record thoroughly, decided in its meeting yesterday to turn down your request for permission to switch fields from American history to European history. In addition, and far more seriously, the Graduate Committee voted unanimously to dismiss you from our graduate program, effective immediately.

Several reasons prompted the Graduate Committee's decision to dismiss you from the program. First, the Graduate Committee noted that you have failed to make satisfactory progress toward completing the requirements for your degree since passing your comprehensive examinations more than two years ago. The record reveals that during this interlude you have suggested several different dissertation topics, each with a different director, and none of these topics has resulted in a substantial body of scholarly research and objective historical writing which the department could accept as constituting progress toward your degree. Indeed, the Graduate Committee was unanimous in its judgment that your written work to date raises serious doubts about whether you are capable of conducting original research

and writing objective, scholarly history. In the Graduate Committee's view, your written work suggests that you are primarily a polemicist who substitutes political ideology for original research and scholarly analysis.

The Graduate Committee's second concern centered on your teaching. After reviewing the student comments in your file and comparing them with those of professors who have supervised you as a graduate teaching assistant, the Graduate Committee concluded that grave doubts exist about your ability to become a satisfactory classroom teacher. Your record to date suggest that your approach to teaching is essentially argumentative—that you view the classroom as a forum for persuading students to accept your views rather than a learning center where faculty and students alike attempt to understand the past on its own terms and reach well-informed, independent conclusions about history.

The graduate committee's third (and final) concern focused upon your professional conduct. Your record reveals that you have often found yourself in disagreement with the department's evaluation of your work and that you have consistently refused to accept the department's right to pass judgment on your academic performance. The members of the Graduate Committee therefore agreed that our department has nothing to teach you. In our judgment, you are unteachable.

You have the right to appeal your dismissal. Should you decide to exercise your right of appeal, please contact Dr. John Ettling, our department chairperson. He will explain your rights.

In May of 1987, Vaksman appealed the matter of his dismissal to four members of the graduate committee. Both Vaksman and Professor Egan appeared before these members. They declined to change their decision.

Vaksman then took the matter before a committee comprised of University faculty not from the History Department. Vaksman provided written documentation to the committee, including favorable letters from 12 students who had attended classes he taught.

The committee upheld the decision to expel Vaksman.

Vaksman then requested that an ad hoc committee be formed to consider his dismissal. The University formed the committee, which also included no members of the History Department. The committee invited Vaksman to appear before it. Vaksman declined because he was not allowed to have an investigator from the Equal Employment Opportunity Commission present or to tape the proceedings. The committee upheld the decision to expel Vaksman. The dean of the College of Humanities and Fine Arts ratified the decision.

Vaksman filed suit in federal court against the members of the graduate committee, the dean of the College of Humanities and Fine Arts, and the president and board of regents of the University, alleging that they deprived him of a property interest and a liberty interest without affording him due process. He also alleged that they violated his First Amendment right to freedom of speech.

In a concurrent state court action, Vaksman sued members of the board of regents and the president of the University in their official capacities, and the dean, department chair, and the members of the graduate committee that expelled him, individually and in their official capacities. He sought reinstatement to the doctoral program, compensatory damages, punitive damages, and attorney's fees. The defendants asserted the defenses of governmental immunity on the claims against them in their official capacities and quasi-judicial immunity on the claims against them in their individual capacities.

The state court action was tried to the bench, and the court awarded Vaksman $32,500 in actual damages and $90,000 in attorney's fees. The court also ordered that Vaksman be reinstated in the doctoral program. The judgment recites that Vaksman is to recover $10,000 of the damages award from Professor Jones, of the graduate committee, and Professor Ettling, the chairperson of the History Department, in their individual capacities.

The court made the following conclusions of law:

* The defendants "violated Article 1, Section 8 of the Texas Constitution, the right to free expression."

* The defendants "violated the liberty interest of plaintiff under the First and Fourteenth Amendments of the United States Constitution."

* The defendants "violated due process of plaintiff under Article 1, Section 19 of the Texas Constitution."

* The defendants "breached their contract with plaintiff under the catalog of admission."

* There was no "intentional interference with contract."

* The defendants' conduct was in their official capacities only, "with the exception of James H. Jones and John Ettling."

### Points of Error I and VIII: Due Course and Due Process

In point of error one, the appellants contend that there was no evidence or factually insufficient evidence to support the trial court's finding that they violated Vaksman's right to due course of law under the Texas Constitution. In point of error eight, they argue that there is no evidence or factually insufficient evidence to support the trial court's finding that they violated Vaksman's right to due process of law under the United States Constitution.

Article I, section 19 of the Texas Constitution states that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19. The Fourteenth Amendment to the United States Constitution provides that "[no] . . . State [shall] deprive any person of life, liberty or property without due process of law." U.S. CONST. amend. XIV.

We evaluate the due process claims under the federal standard even though the state constitution provides greater protection. *See Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex. 1983). Thus, if a federal due process violation was proved, the evidence will prove a state violation, as well.

### 1. Was Vaksman entitled to due process?

In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Court declared:

> Since the landmark decision of the Court of Appeals for the Fifth Circuit in *Dixon v. Alabama State Board of Education,* 294 F.2d 150, *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), the lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion.

419 U.S. at 576 n. 8, 95 S.Ct. at 737 n. 8; *accord Esteban v. Central Missouri State College,* 415 F.2d 1077, 1089 (8th Cir.1969). We have recognized that when a student is dismissed from a state university, the requirements of procedural due process apply. *University of Texas Medical Sch. v. Than,* 834 S.W.2d 425, 432 (Tex.App.—Houston [1st Dist.] 1992, no writ); *University of Houston v. Sabeti,* 676 S.W.2d 685, 687–88 (Tex. App.—Houston [1st Dist.] 1984, no writ) ("Attendance at a state university is an interest protected by the due process clause of the fourteenth amendment[.]").[1]

1. The appellants raise a res judicata argument in regard to Vaksman's interest in attendance at a state university. They contend:

> The federal court dismissed Vaksman's federal due process claims after finding that he did not have a property interest in continued enrollment in the graduate program. . . . The [state] district court indicated that it was applying the principles of res judicata to Vaksman's state law claims, however, it concluded that Vaksman had a property interest in continued enrollment.

> The federal court's determination that Vaksman had no protected property interest barred relitigation of that issue in the state district court.

The final federal judgment to which the appellants refer *is not in our record.* The record contains only an interlocutory order of the federal district judge. A party asserting the defense of res judicata has the burden to present evidence establishing that res judicata should apply, including the final judgment from the prior suit. *Walker v. Sharpe,* 807 S.W.2d 442, 447 (Tex. App.—Corpus Christi 1991, no writ); *City of*

We hold that Vaksman was entitled to procedural due process under the state and federal constitutions.

## 2. What was the nature of Vaksman's dismissal?

■ There are two types of valid dismissals: disciplinary and academic. *Board of Curators v. Horowitz*, 435 U.S. 78, 87, 98 S.Ct. 948, 953, 55 L.Ed.2d 124 (1978); *Than*, 834 S.W.2d at 430. When a student is dismissed for disciplinary reasons, notice of the charges, notice of the evidence to be used against the student, and a hearing are required. *See Sabeti*, 676 S.W.2d at 689; *Esteban*, 415 F.2d at 1089. A dismissal for academic reasons "calls for far less stringent procedural requirements" than a dismissal for disciplinary reasons. *Horowitz*, 435 U.S. at 86, 98 S.Ct. at 953; *see Than*, 834 S.W.2d at 430. This case is one of academic dismissal.

■ The appellants argue that we should give "great respect to the decisions made by the professional educators." It is true that "[w]hen courts review the substance of academic decisions ... they should show great respect for the teacher's professional judgment." *Clements v. County of Nassau*, 835 F.2d 1000, 1005 (2nd Cir.1987). This sound rule is based on the belief that university administrators, not judges, should make academic decisions needed to run a university. This assumes, of course, that the academic decision was made in good faith. The trial judge found that the appellants acted in bad faith. If evidence supports that finding, relief was justified. *Ikpeazu v. University of Nebraska*, 775 F.2d 250, 253 (8th Cir.1985) "An actionable deprivation in an academic dismissal case is proved ... if the decision was motivated by bad faith or ill will unrelated to academic performance." *Id.; see Clements*, 835 F.2d at 1005.

*Houston v. Houston Chronicle Publishing Co.*, 673 S.W.2d 316, 321 (Tex.App.—Houston [1st Dist.] 1984, no writ). The appellants have not met this burden.

Appendices A, B, and C to the opinion dissenting in part and concurring in part are items which the author of the majority opinion and the justices joining therein have never seen. They are

■ A verdict in a bad faith academic dismissal case should not be reversed unless no reasonable minds could have found as the judge or jury did. *Ikpeazu*, 775 F.2d at 255. The factfinder's threshold decision of whether the university acted in bad faith is an ordinary fact issue that is decided under the ordinary standard of review. *Hankins v. Temple Univ.*, 829 F.2d 437, 440–43 (3rd Cir.1987). In deciding *motive*, we give no deference to the appellants' prerogatives, because nobody has a prerogative to act in bad faith. *See Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) (stressing the difference between good faith and bad faith dismissals); *Haberle v. University of Alabama*, 803 F.2d 1536, 1540 (11th Cir.1986) (same).

■ The trial judge, sitting as the trier of fact, found that the defendants "intentionally harm[ed] [Vaksman] solely because of personal disagreements or grievances wholly apart from academic considerations." [2] He found that Vaksman was "summarily expelled for alleged, if not fabricated, academic insufficiencies," and because of "matters of personality and speech," and that his dismissal was "well beyond the limits" proscribed for "learned professionals." He further found that Vaksman's dismissal "was in and of itself outrageous and extreme," and was "totally anathema to free academic environs." These are findings of bad faith. If evidence supports that finding, the appellants are not entitled to the deferential standard of review used in cases of good faith academic dismissals.

## 3. The evidence of bad faith

■ We now review the record to determine if the trial judge's findings on bad faith and ill will are supported by the evidence.

Three University of Houston faculty members, Professors Rothman, Coffman, and Egan, appeared for Vaksman at trial. They

not part of the record before us, and we have not considered them. No one has asked us to take judicial notice of these items, nor have we taken judicial notice of them on our own.

**2.** The judge's findings of fact are reproduced in the appendix to this opinion.

testified that the dismissal was improper, that it was not based on academic grounds, and that the dismissal letter contained untrue statements. No witnesses disputed their testimony. The appellants presented no witnesses. They presented only documentary evidence. A review of the testimony showing bad faith and ill will follows.

## Professor Rothman

Professor Rothman stated that Vaksman was an effective classroom teacher. He also addressed the circumstances of Vaksman's dismissal, asserting that:

* after Vaksman completed his examinations, there was no reason to expel him before five years had run from the time he began his dissertation;

* it is normal to consult a student's dissertation advisor (here, Professor Egan) before expelling a student, which was not done in Vaksman's case;

* a student being considered for expulsion normally gets advance notice of any expulsion hearing, which was not done in Vaksman's case;

* it would be a "shock" for a committee to respond to a student's request to take another exam and enter a different study area by dismissing him from school; and

* students "over and over" take two and one-half years or more to pick a dissertation topic.

## Professor Coffman

Professor Coffman testified (in person and by written statement) that he invited Vaksman to lecture to his students in geography. He also testified in regard to the History Department faculty's attitude toward Vaksman's political views. He stated that:

* Vaksman's articles about the strategic importance of South Africa "got him in trouble with our politically correct faculty in the history department very seriously because that's almost an undiscussable subject, and he discussed it;"

* some history faculty members espouse Marxist views and believe that those who differ with their views, as Vaksman did openly, are "morally wrong as well as academically wrong;"

* he observed a Marxist outlook in the history faculty before the South Africa controversy, in a case involving another anti-communist student;

* in the earlier case, a history professor told him that the student may be working for a foreign intelligence agency and might pose a physical danger;

* similar rumors about Vaksman being a physical danger to the faculty were spread;

* "the real vehicle which allowed the history department to cashier Mr. Vaksman was a cowardly whisper campaign that he was homicidal maniac, lurking in hallways and frightening professors;"

* the conclusion in Vaksman's dismissal letter that Vaksman was "unteachable" was "patently absurd" as applied to a doctoral candidate in that department, because "when the examining committee passed Mr. Vaksman in his doctoral examinations, they in effect declared him taught;"

* the "precipitate action" of the History Department "clearly suggests less laudable motivations;"

* "none of this action would have been taken against a quiet native Anglo–American with similar political opinions;"

* Vaksman "may have presented an embarrassing challenge to the current academic dogma and, perhaps more crucially, to the posturings of our history department in the academic pecking order—it is clear that an outspoken, anti-Soviet, anti-Marxist Soviet emigree/doctoral candidate is a deficit in the status seeking academic board game;" and

* when refugee students like Vaksman "are so unwise politically, or courageous, as to insist that their own experience in a Marxist society was perhaps even worse and more oppressive than our 'propaganda' might suggest, the refugee student then represents a severe threat to the ideological position and even to the academic integrity of the academicians who disagree."

## Professor Egan

Professor Egan was Vaksman's dissertation advisor. The graduate committee did

not consult him before expelling Vaksman, even though Professor Egan was the one faculty member responsible for directing Vaksman.

Professor Egan testified that:

* Vaksman was expelled because he was "an irritant" to the people in charge of the History Department;

* before Vaksman was expelled, he had become "persona non grata;"

* he (Egan) was never officially notified of the reason for Vaksman's dismissal;

* the History Department was "very public relations oriented," and Vaksman was considered "an embarrassment" because of his speaking out on a variety of causes and seeking to discover ways in which university money was being spent;

* he never believed Vaksman was dismissed for academic reasons;

* he was never provided a copy of Vaksman's dismissal letter;

* the dismissal letter "didn't make a whole lot of sense;"

* he was "taken aback" at the statement that Vaksman was "unteachable;"

* Vaksman embarrassed the University when he spoke out against the "morass our athletic department is," and its "substantial deficit" that resulted in "many, many dollars having been pumped into it that presumably could have been put in other university programs;"

* Vaksman's criticisms did not "sit well" with the History Department;

* Vaksman caused a legislative investigation into improper spending in the History Department, which "rankled people, [and] caused feathers to fly;"

* he never received any notice whatsoever that Vaksman was being considered for dismissal;

* the graduate committee's conduct was "rude and unprofessional;"

* he was not concerned about the time Vaksman was taking to write his dissertation because many other students took "extraordinary periods" of time on dissertations;

* one student was allowed to work on a dissertation for 14 years and another for 12 years;

* there was a "major change in the department of history in the early 1980s, and a whole new mentality" was promoted by Professor Martin, whose goal was to have a "high-profile department" that would "look good in the eyes of upper echelon administration;"

* Professor Martin "talked of showcasing our wares," and Vaksman's criticism was destructive to Professor Martin's goals;

* John Ettling was "upset" when Vaksman went to a professional meeting of historians in Houston and talked to the president of this large group;

* Vaksman learned that the wife of University of Houston President Van Horn had prepared a manuscript for her doctoral dissertation that was "in very poor shape," and President Van Horn used public funds to hire an editorial assistant from the History Department to revise his wife's manuscript;

* the History Department was embarrassed by this, because the manuscript had been presented for publication by the previously mentioned Professor Martin;

* he was "upset" by this expenditure of public funds and regarded it as "unethical," but the History Department went along with it anyway; and

* the department appeals procedure available to Vaksman was a process Egan "never took seriously" because it was "a part of the bureaucracy" and "people would not be appointed to it who would simply look at things objectively."

Vaksman also testified. He stated that:

* before he was dismissed, no faculty member ever told him that his progress was unsatisfactory;

* during the two and one-half years he pursued his dissertation, he read widely in the relevant literature under the direction of his advisor, Professor Egan, and wrote a book, *Ideological Struggle,* which was published by an academic press after it passed the process of peer review;

* he gave papers at historical conventions in San Francisco, at Texas A & M, and elsewhere;

* he did much more work in the area of presenting convention papers than other graduate students;

* one of his convention papers was commended by the president of a history society who wrote a letter to University of Houston Chancellor (later President) Van Horn, describing Vaksman's paper as "outstanding;"

* his book, *Ideological Struggle*, was assigned as reading in a course at the University of Houston;

* more than 100 university research libraries bought his book;

* he was invited to speak to classes of four different University of Houston professors, in the fields of history, geography, English, and sociology;

* Professor Egan told him that the history faculty was "terrified" of a Texas senator's probe of its spending practices, a probe that had been generated by Vaksman's criticism.

The trial judge could have believed all of the testimony recited above, and, in addition, could have made all reasonable inferences from it. *AATCO Transmission Co. v. Hollins*, 682 S.W.2d 682, 685 (Tex.App.—Houston [1st Dist.] 1984, no writ). There was no testimony to the contrary; as noted, the appellants relied solely on documentary evidence and presented no witnesses. When litigants fail to testify without explanation, a trier of fact may infer that they did not testify because they knew their testimony would hurt them and would help the other side. *Carrillo v. State*, 566 S.W.2d 902, 912 (Tex.Crim.App.1978); *Winkle v. State*, 506 S.W.2d 891, 897 (Tex.Crim.App.1974) (State may argue that defendant did not call a codefendant to testify because the testimony would have been harmful); *Texas Power & Light Co v. Walker*, 559 S.W.2d 403, 406 (Tex.Civ.App.—Texarkana 1977, no writ);

*Lindsey v. State*, 194 S.W.2d 413, 417–18 (Tex.Civ.App.—Eastland 1946, writ ref'd n.r.e.). The dissenting opinion documents the evidence of Vaksman's academic deficiencies, but the trial judge did not have to believe that these deficiencies, rather than personal animosity, motivated the dismissal.

Based on the testimony of Professors Egan, Coffman, and Rothman, and that of Vaksman himself, the trial judge could have concluded that the appellants considered Vaksman to be an obnoxious, embarrassing, politically incorrect pest, and expelled him for those reasons—reasons of "bad faith or ill will unrelated to performance." *Ikpeazu*, 775 F.2d at 253. The evidence of bad motive is mainly [3] circumstantial, but that is usually the case. That is why the law allows motive, or any ultimate fact, to be proved by circumstantial evidence. *State v. $11,014.00*, 820 S.W.2d 783, 785 (Tex.1991); *Investment Properties Management, Inc. v. Montes*, 821 S.W.2d 691, 695 (Tex.App.—El Paso 1991, no writ); *Paragon Hotel Corp. v. Ramirez*, 783 S.W.2d 654, 658 (Tex.App.—El Paso 1989, writ denied); *see Clements*, 835 F.2d at 1005 (summary judgment in academic dismissal case is unwarranted where state of mind is the critical issue and "solid circumstantial evidence exits to prove plaintiff's case"); *accord Wakefield v. Northern Telecom, Inc.*, 813 F.2d 535, 541 (2d Cir.1987).

The trial judge's determinations that the appellants "intentionally harm[ed] [Vaksman] solely because of personal disagreements or grievances wholly apart from academic considerations," that Vaksman was dismissed because of "matters of personality and speech," that his dismissal was "well beyond the limits" proscribed for "learned professionals," and that his dismissal "was in and of itself outrageous and extreme," are supported by ample evidence. Thus, Vaksman demonstrated an "actionable deprivation" of due process in this case of a purported academic dismissal. *Ikpeazu*, 775 F.2d at 253.

---

**3.** There was direct evidence that one defendant who voted to expel Vaksman, Professor Sally Vaughn, did so in part because of Vaksman's "unprofessional conduct in public statements slanderous (and untrue) about the department of history." She wrote that in a memo. Based on the testimony of Professors Egan, Coffman, and Rothman, the trial judge could have concluded that the other defendants voted to expel Vaksman for similar reasons, but did not write it down.

We overrule point of error one and that portion of point of error eight that challenges the sufficiency of the evidence supporting the trial court's finding that the appellants violated Vaksman's right to due process of law under the United States Constitution and the Texas Constitution.

### Points of Error II and VIII: Freedom of Speech

In points of error two and eight, the appellants argue that there was no evidence or insufficient evidence to support the trial court's finding that they violated Vaksman's right to freedom of speech under the Texas and United States Constitutions.

Article I, section 8 of the Texas Constitution provides:

> Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.

TEX. CONST. art. I, § 8.

The First Amendment to the United States Constitution provides:

> Congress shall make no law ... abridging the freedom of speech[.]

U.S. CONST. amend. I. Both constitutions provide grounds for imposing civil liability for the violation of a person's right to freedom of speech. *Jones v. Memorial Hosp. Sys.*, 746 S.W.2d 891, 893–94 (Tex.App.—Houston [1st Dist.] 1988, no writ) (*Jones II* ).

#### 1. The Standard of Review

 Findings of fact in a case tried to the court have the same force and dignity as a jury's verdict upon special issues. *Daca, Inc. v. Commonwealth Land Title Ins. Co.*, 822 S.W.2d 360, 362 (Tex.App.—Houston [1st Dist.] 1992, writ denied). Findings of fact are not conclusive, however, where (as here) a complete statement of facts appears in the record. *Id.* In deciding a no evidence point, we consider only the evidence and the infer-

ences therefrom that tend to support the finding, and disregard all evidence and inferences to the contrary. *King v. Bauer*, 688 S.W.2d 845, 846 (Tex.1985); *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920, 923 (Tex. App.—Houston [1st Dist.] 1988, no writ). If there is more than a scintilla of evidence to support the finding, we must overrule the "no evidence" point. *Joseph*, 749 S.W.2d at 923. In reviewing a factual insufficiency point, we examine all of the evidence, both that which supports the finding and that which contradicts the finding. *Id.* We may set aside the finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *Id.* "We may not substitute our opinion for that of the trier of fact merely because we might have reached a different fact conclusion." *Id.*

#### 2. Vaksman's Burden of Proof

 The Texas Constitution provides greater rights of free expression than its federal counterpart. *Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex.1992).[4] Thus, if the proof shows a denial of free speech under federal law, then, *a fortiori*, Vaksman has proved a violation under state constitutional law. If Vaksman met the federal standard set out in *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), his proof is also sufficient to show a violation of Article I, section 8 of the Texas Constitution.

Under the *Mt. Healthy* test, Vaksman's burden was to prove that (1) his conduct was protected, and (2) his conduct was a "motivating factor" in the graduate committee's decision to dismiss him. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576; *Jones v. Memorial Hosp. Sys.*, 677 S.W.2d 221, 224–25 (Tex. App.—Houston [1st Dist.] 1984, no writ) (*Jones I* ).

#### Was Vaksman's speech constitutionally protected?

 To be protected by the First Amendment, speech must address a matter

---

4. The distinction between the two provisions is that the Texas Constitution guarantees in *affirmative* terms that every person has the right to speak his or her opinion on any subject, while the United States Constitution "expresses First Amendment freedoms in *negative* terms, simply restricting governmental interference with such freedoms." *Jones II*, 746 S.W.2d at 893 (emphasis added).

of public concern. *Connick v. Meyers,* 461 U.S. 138, 146, 149, 103 S.Ct. 1684, 1690, 1691, 75 L.Ed.2d 708 (1983); *Jones I,* 677 S.W.2d at 224. Speech that is "solely in the individual interest of the speaker and its ... audience" is not speech on a matter of public concern. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 762, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 (1985). Whether speech addresses a matter of public concern is determined by the content, form, and context of the speech. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690; *Jones I,* 677 S.W.2d at 224.

■ Here, Vaksman's speech addressed and criticized, among other subjects, (1) the apartheid-inspired United States sanctions against South Africa; (2) the political oppression committed by the government of the Soviet Union; (3) the expenditure of funds by the University of Houston, a state university, on athletics rather than academics; (4) the alleged improper use of public funds by the University, criticism that generated a legislative inquiry into the alleged misuse; and (5) the failure of the University to hire more minority faculty members.

Vaksman's criticisms were conveyed to the public. He aired his views in the media. He wrote articles in newspapers, wrote letters to the editor that appeared in newspapers, appeared on radio talk shows, gave lectures, and spoke at seminars. Where the speaker does not "seek to bring to light actual or potential wrongdoing or breach of public trust," this weighs against a finding that the speech was of public concern. *Connick,* 461 U.S. at 148, 103 S.Ct. at 1691. Here, Vaksman's speech was presented to the public.

When speech reflects only an individual's dissatisfaction and an attempt to turn that dissatisfaction into a cause celebre, the speech is not of public concern. *Connick,* 461 U.S. at 148–49, 103 S.Ct. at 1691. Vaksman's speech, however, did not attempt to elevate a personal peeve into a cause; his speech addressed matters that were already genuine public causes.

We hold, under both constitutions, that Vaksman's speech was constitutionally protected. Vaksman met the first part of the burden articulated in *Mt. Healthy.*

### Was Vaksman's speech a substantial factor in his dismissal?

■ Professor Coffman testified that Vaksman's articles on the strategic importance of South Africa "got him in trouble" with the "politically correct faculty in the History Department very seriously because that's almost an undiscussable subject, and he discussed it." Professor Egan stated that the History Department was "very public relations oriented," and Vaksman was considered "an embarrassment" because of his speaking out on issues and attempting to discover ways in which University money was being spent. He asserted that Vaksman embarrassed the University when he spoke out against the "morass our athletic department is," and its "substantial deficit" that resulted in "many, many dollars having been pumped into it that presumably could have been put in other university programs."

Professor Egan further testified that Vaksman's criticisms did not "sit well" with the History Department. In fact, one defendant, a member of the graduate committee, wrote that she was voting to dismiss Vaksman in part because of his "public statements slanderous (and untrue) about the department of history[.]" Professor Egan noted that the legislative investigation Vaksman sparked "rankled people, [and] caused feathers to fly." Vaksman stated that Professor Egan told him that the probe "terrified" the history faculty. *See* footnote 2, above.

The trial court could have concluded from this evidence that Vaksman's speech was a substantial factor in the graduate committee's decision to dismiss him. Vaksman met the second part of his *Mt. Healthy* burden.

We overrule point of error two and that part of point of error eight that challenges the sufficiency of the evidence to support the trial court's finding that the appellants violated Vaksman's right to freedom of speech under the United States Constitution.

### Points of Error III and IV: Governmental Immunity

In point of error three, the appellants argue that the trial court erred in awarding

damages for Vaksman's breach of contract claim because contract claims against the State are barred by the doctrine of governmental immunity. In point of error four, they contend that the trial court erred in awarding damages against them in their official capacities, because, as State officials and employees, they are entitled to share in the State's governmental immunity.

■ In *University of Texas v. Babb*, 646 S.W.2d 502 (Tex.App.—Houston [1st Dist.] 1982, no writ), we held that a school's catalog constitutes a written contract between the educational institution and the student where the student entered the institution under the catalog's terms. *Id.* at 506. Vaksman and the University of Houston therefore had a contract under the University's 1982 catalog, and the trial court so found in its conclusions of law.

■ The University of Houston is a state institution. TEX.EDUC.CODE ANN. § 111.02 (Vernon 1991). Therefore, Vaksman's contract was with the State. *See Courtney v. University of Texas Sys.*, 806 S.W.2d 277, 281 (Tex.App.—Fort Worth 1991, writ denied) (contract with University of Texas System, a state institution, was a contract with the State). Although Vaksman did not name the State as a defendant, his suit was against the State. When, as here, State employees are sued in their official capacities for acts they performed within the scope of their authority,[5] the suit is against the State. *Director of Dep't of Agriculture & Environment v. Printing Indus. Ass'n*, 600 S.W.2d 264, 266, 270 (Tex.1980); *Short v. W.T. Carter & Brother*, 133 Tex. 202, 126 S.W.2d 953, 962 (1938).

■ The State, including state universities, generally enjoys sovereign immunity from suit. *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex.1976). One court has held that "the sovereign immunity doctrine does not apply to contracts made by the State, or any of its agencies under our Constitution[.]" *Industrial Constr. Management v. DeSoto Indep. Sch. Dist.*, 785 S.W.2d 160, 163 (Tex.App.—Dallas 1989, no writ); *see*

*also Palacios Seafood, Inc. v. Piling, Inc.*, 888 F.2d 1509, 1512 n. 9 (5th Cir.1989) (construing Texas law) ("If the state enters into a contract, it consents, like any citizen, to be sued if it breaches the agreement.").

The statement in *DeSoto* was dicta because the court conceded that a statute authorized suits against that particular school board. 785 S.W.2d at 163. The *DeSoto* opinion has been criticized and not followed. *Pickell v. Brooks*, 846 S.W.2d 421, 424–26 (Tex.App.—Austin 1992, no writ); *Dillard v. Austin Indep. Sch. Dist.*, 806 S.W.2d 589, 592–93 (Tex. App.—Austin 1991, writ denied); *Courtney*, 806 S.W.2d at 284. We disagree with the quoted statements in *DeSoto* and *Palacios Seafood,* and we decline to hold, as those courts did, that the State automatically consents to be sued every time it enters a contract.

The State waives its immunity from *liability* when it contracts. *Fristoe v. Blum*, 92 Tex. 76, 45 S.W. 998, 999 (1898). However, the State retains its immunity from *suit*, a distinction repeatedly recognized by the Supreme Court of Texas. *W.D. Haden Co. v. Dodgen*, 158 Tex. 74, 308 S.W.2d 838, 842 (1958); *State v. Elliott*, 212 S.W. 695, 698–701 (Tex.Civ.App.—Galveston 1919, writ ref'd). The State may consent to suit by enacting a statute that waives immunity or by passing a legislative resolution. Once it does so, it is liable under contract law the same as anyone else. Here, the State never consented to be sued. We have found no authority allowing recovery of money damages against the State without its consent in a "pure" contract case. *Courtney*, 806 S.W.2d at 281–82. Thus, this damage award cannot be upheld based on breach of contract, because Vaksman had no consent to sue the State for breach of contract.

Nevertheless, courts have allowed expelled students and fired teachers to sue state universities without consent for constitutional violations and to seek injunctions and reinstatement. *Courtney*, 806 S.W.2d at 284–87; *Bagg v. University of Texas Medical Branch*, 726 S.W.2d 582, 586–87 (Tex.App.—

---

5. The dismissal of students at the University of Houston is within the appellants' scope of au-

thority. TEX.EDUC.CODE ANN. § 111.20(c) (Vernon 1991).

Houston [14th Dist.] 1987, writ ref'd n.r.e.) (allowing an employee to sue university officials in their individual capacities for money damages, but holding the officials to be immune in their official capacities). Such plaintiffs have also been allowed to sue school officials in their individual capacities for money damages. *Perry v. Texas A & I Univ.*, 737 S.W.2d 106, 109–10 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.) (allowing suit against state university officials for money damages based on alleged bad faith violations of constitutional rights).[6]

These cases show that consent is needed to sue the State when the suit is solely for money damages for breach of contract. *See Texas Technological College v. Fry*, 278 S.W.2d 480, 481 (Tex.Civ.App.—Amarillo 1954, no writ); *Walsh v. University of Texas*, 169 S.W.2d 993, 994 (Tex.Civ.App.—El Paso 1942, writ ref'd). However, consent is not needed when, as here, the breach of contract (or other government action) constitutes a state constitutional violation and the plaintiff seeks a remedy other than money damages. *See* cases cited at footnote 5; *Courtney*, 806 S.W.2d at 283–85 (professor's suit "does not rest on contractual grounds alone, for we must consider the claimed divestment of Courtney's property right in his job"); *Jones II*, 746 S.W.2d at 893–94 (recognizing article 1, section 8 of the Texas Constitution as "an independent legal basis for a cause of action" and citing out-of-state authorities allowing relief, including money damages, for violations of state constitutional rights); *Jones I*, 677 S.W.2d at 225–26 (action based solely on article 1, section 8 of Texas Constitution may be brought for reinstatement, declaratory judgment, and "related relief").

This Court recognized a "constitutional tort," denial of free speech, in *Jones II*, but

we did not state that money damages could be recovered. 746 S.W.2d at 893–94. We cited with approval one case, *Mt. Healthy*,[7] allowing money damages for the federal constitutional torts of denial of free speech and due process, as well as a commentator[8] advocating such relief and citing several states allowing it. But even when a suit is brought in state court for federal constitutional torts, "the states retain the power to determine whether a plaintiff may sue a state in state court on claims arising out of that tort." *Bagg*, 726 S.W.2d at 586. Vaksman cites no authority upholding such a money judgment against state officials in their official capacities. We conclude that consent is required to bring suit for a money judgment that would be paid from the state treasury. *W.D. Haden Co.*, 308 S.W.2d at 840–41; *Lopez v. Public Util. Comm'n*, 816 S.W.2d 776, 781 (Tex.App.—Austin 1991, writ denied); *Commissioner, Texas Dep't of Human Serv. v. Trinity Coalition*, 759 S.W.2d 762, 764 (Tex. App.—El Paso 1988, writ dism'd), *cert. denied*, 493 U.S. 1020, 110 S.Ct. 719, 107 L.Ed.2d 739 (1990). There being none here, the money judgment against the appellants in their official capacities must be set aside.

That leaves the question of remedy. An injunction ordering reinstatement is a proper remedy. *See* cases cited at footnote 5; *Jones I*, 677 S.W.2d at 225. So is an award of money damages against defendants held liable in their individual capacities, i.e., Professors Jones and Ettling. *Perry*, 737 S.W.2d at 109–10; *Bagg*, 726 S.W.2d at 586–87. The appellants held liable in their official capacities are immune in that capacity from the remedy of money damages. *Bagg*, 726 S.W.2d at 586.

We sustain points of error three and four and hold that all the appellants are immune

---

**6.** There are other exceptions to the consent requirement. *See Printing Indus. Ass'n*, 600 S.W.2d 264 (Tex.1980) (no consent required to sue for injunction to prevent violations of state constitutional rights); *Texas Highway Comm'n v. Texas Ass'n of Steel Importers*, 372 S.W.2d 525 (Tex.1963) (no consent required to sue for declaratory judgment and injunction to halt agency action in violation of statute); *Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709 (1945) (no consent required to sue for declaratory judgment to determine application of tax statute to plaintiff); *State v. Epperson*, 121 Tex. 80, 42 S.W.2d 228 (1931) (no consent required for action to

compel refund of illegally collected taxes); *Imperial Sugar Co. v. Cabell*, 179 S.W. 83, 89 (Tex.Civ. App.—Galveston 1915, no writ) (trespass to try title).

**7.** *Mt. Healthy* is cited in *Jones II* as "*City School Dist. Board of Educ. v. Doyle.*" 746 S.W.2d at 894.

**8.** Friesen, *Recovering Damages For State Bill of Rights Claims*, 63 Tex.L.Rev. 1269, 1280–84 (1985); *contra Bagg*, 726 S.W.2d at 584 n. 1 ("There is no state constitutional tort.").

from an award of money damages assessed against them in their official capacities, and are also immune from a judgment based on breach of contract. That award is set aside.

## Point of Error V: Quasi-judicial Immunity

In point of error five, the appellants assert that the trial judge erred in ordering that Vaksman recover $10,000 of the $32,500 damages award from Professors Jones and Ettling in their individual capacities. They claim that Jones and Ettling are protected by the doctrine of quasi-judicial immunity.

Quasi-judicial immunity protects public officials when they (1) act within the course and scope of their office, (2) perform discretionary functions, and (3) act in good faith. *Perry,* 737 S.W.2d at 110; *Anderson v. Higdon,* 695 S.W.2d 320, 324 (Tex.App.—Waco 1985, writ ref'd n.r.e.). Quasi-judicial immunity is an affirmative defense. *Perry,* 737 S.W.2d at 110; *Austin v. Hale,* 711 S.W.2d 64, 66 (Tex.App.—Waco 1986, no writ). Therefore, the official must plead and prove all of its elements. *Perry,* 737 S.W.2d at 110.

We have already discussed the evidence supporting the trial judge's findings of bad faith. Professors Jones and Ettling did not conclusively prove that, as a matter of law, they acted in good faith. Thus, they are not immune from the $10,000 damage award.[9]

We overrule point of error five.

## Point of Error VI and Cross-point I: Attorney's Fees

In point of error six, the appellants contend that no constitutional, statutory, or contractual provision allows a recovery of attorney's fees in this case. In his sole cross-point of error, Vaksman contends that the trial judge abused his discretion because the award of $90,000 was too low.

Vaksman's sole authority for the recovery of attorney's fees is TEX.CIV.PRAC. & REM. CODE ANN. §§ 104.001–.002 (Vernon 1986). We agree with Vaksman that the pre–1987

version of the statute applies. The 1987 version applies "only to a cause of action that accrues on or after the effective date of this act," which was in 1987. Act of August 3, 1987, 70th Leg., 2d C.S., ch. 29, 1987 Tex. Gen.Laws 107. Vaksman's cause of action accrued in 1986. Even under the pre–1987 provision, however, Vaksman cannot recover attorney's fees.

The pre–1987 version of the statute provides:

§ 104.001. State Liability; Persons Covered

In a cause of action based on conduct described in Section 104.002, the state is liable for ... attorney's fees adjudged against:

(1) an employee, a member of the governing board, or any other officer of a state agency, institution, or department[.]

....

§ 104.002. State Liability; Conduct Covered

The state is liable under this chapter only if the damages are based on the act or omission by the person in the course and scope of the person's office, employment, or contractual performance for or service on behalf of the agency, institution, or department and if:

....

(2) the damages arise out of a cause of action for deprivation of a right, privilege, or immunity secured by the constitution or laws of this state or the United States, *except when the court in its judgment or the jury in its verdict finds that the person acted in bad faith.*

TEX.CIV.PRAC. & REM.CODE ANN. §§ 104.001–.002 (emphasis added).

The trial judge's findings, quoted above and fully set out in the appendix, are findings of bad faith. Thus, the State is not liable under section 104.002. Several cases have allowed attorney's fees under section 104.002, but in those cases there was no finding of bad faith. *See Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 398 (Tex.1989); *Texas State Employees Union v. Texas Dep't of*

---

9. The trial judge found that Professors Jones and Ettling, alone among the appellants, intentionally inflicted emotional distress upon Vaksman. We conclude this because the judge found emotional distress damages of $10,000; found only Jones and Ettling to be individually liable; and awarded judgment for that exact amount, $10,000, against Jones and Ettling individually.

*Mental Health,* 746 S.W.2d 203, 207 (Tex. 1987); *see also Camarena v. Texas Employment Comm'n,* 754 S.W.2d 149, 151–52 (Tex. 1988) (allowing attorney's fees for racial discrimination under TEX.CIV.PRAC. & REM.CODE ANN. §§ 106.001–.002, which has no exception for bad faith).

We conclude that all the appellants who we have held immune from money damages are for the same reasons immune from an award of attorney's fees. Neither can the award of attorney's fees be enforced against Professors Jones or Ettling. The judgment did not award attorney's fees against Jones and Ettling in their individual capacities, but only in their official capacities. Their personal liability was limited to $10,000, which was "inclusive of the above damages found against the various defendants in their official capacity." The "above damages" included the award of attorney's fees. Moreover, attorney's fees are not available as damages for the tort of intentional infliction of emotional distress. *See Gannett Outdoor Co. v. Kubeczka,* 710 S.W.2d 79, 90 (Tex.App.—Houston [14th Dist.] 1986, no writ) (attorney's fees are not recoverable in *any* tort action unless authorized by statute; no statute authorizes recovery of attorney's fees for the tort of intentional infliction of emotional distress).

We sustain point of error six.

Because of our holding, we necessarily overrule Vaksman's cross-point contending that the award was too low.

### Point of Error VII: Vaksman's Pleadings Regarding the First and Fourteenth Amendments

■ In point of error seven, the appellants argue that the trial judge erred in finding that they violated Vaksman's First and Fourteenth Amendment rights because Vaksman requested no such relief in his pleadings. We overrule this point for several reasons. First, the appellants' brief does not cite any place in the record where this complaint was preserved for review. Thus, it has been waived on appeal. TEX.R.APP.P. 74(d), (f); *Henry S. Miller Management Co. v.*

*Houston State Assocs.,* 792 S.W.2d 128, 131 (Tex.App.—Houston [1st Dist.] 1990, writ denied). Second, absent a trial court objection, we presume the issue was tried by consent. TEX.R.CIV.P. 67. Finally, Vaksman's original petition specifically mentioned the First and the Fourteenth Amendments. Absent special exceptions, we will liberally construe the petition in favor of the pleader. *Roark v. Allen,* 633 S.W.2d 804, 809–10 (Tex.1982).[10]

We overrule point of error seven.

### Conclusion

We affirm those portions of the judgment that (1) award Vaksman $10,000 from Jones and Ettling in their individual capacities, and (2) order Vaksman reinstated to the doctoral program. We reverse that portion of the judgment that awards Vaksman damages from the rest of the appellants and render judgment that Vaksman take nothing from them. We reverse that portion of the judgment that awards Vaksman attorney's fees and render judgment that Vaksman recover no attorney's fees.

MIRABAL, J., not participating.

HUTSON–DUNN, J., dissents in part and concurs in part.

### *APPENDIX*

No. 88–50122

Fabian Vaksman

vs.

The Members of the Board of Regents

of the University of Houston, et al.

In the District Court of

Harris County, Texas

125th Judicial District

*FINDINGS OF FACT*

*AND*

*CONCLUSIONS OF LAW*

The Court makes the following findings of fact and conclusions of law in the above case:

---

10. Vaksman's live petition at trial was his original petition. It was not included in the transcript. The district clerk informed us that it is missing from its file. By order of November 19, 1993, we ordered Vaksman to furnish the district clerk a sworn copy of his live petition and ordered the clerk to file same with us as a supplemental transcript. This has occurred, and the appellants have made no objections.

*Findings of Fact*

1. Plaintiff, Fabian Vaksman, immigrated to the United States from Russia in 1973.

2. Mr. Vaksman completed all required course work and was awarded a master's degree in history by New York University.

3. Mr. Vaksman applied to and was accepted into the Ph.D. program in history at the University of Houston for the school year beginning in September 1982.

4. Mr. Vaksman successfully completed in 1984 all requirements for the doctor of philosophy degree, including course work, teaching assignments and an oral comprehensive examination. Defendants' Exhibit (Def.Ex.) 19. Mr. Vaksman was notified by letter of his successful completion of these requirements and was told that University policy provided him with five years to complete his dissertation. See Plaintiff's Exhibit (Pl.Ex.) 13.

5. By virtue of completing the course work, teaching, and oral examination requirements, plaintiff achieved the status of "all but dissertation," (hereinafter "ABD"), on May 31, 1984. The University certified this status in its official records as found in Mr. Vaksman's "Candidacy Notification for the Doctoral Degree." Defendant's Exhibit 27. Professor Clifford L. Egan of the History Department was designated plaintiff's dissertation advisor. Def.Ex. 27.

6. Mr. Vaksman was notified by letter on October 29, 1986, that he was dismissed from the Ph.D. program at the University of Houston. Pl.Ex. 33.

7. Plaintiff called as witness at trial three University of Houston professors, Dr. Egan, Dr. Irving Rothman and Dr. John Coffman. Each testified that the letter of dismissal was improper, contained statements that were untrue and was not based on academic grounds.

8. Documentary evidence characterized Mr. Vaksman as an "intelligent," "enthusiastic," student who has a "reasonably well developed writing ability" and "shows a degree of promise" and "can improve and become one of our better students." Def.Exs. 4, 5,

and 8. Other evaluations were less favorable, and some strongly critical.

9. Dr. Rothman, professor of English at the University of Houston, testified that Mr. Vaksman worked with him to improve his writing skills.

10. Russian is Mr. Vaksman's native tongue. English is a second language for him. Mr. Vaksman also has a working knowledge of Hebrew, French, Spanish and German.

11. Mr. Vaksman is an outspoken social critic who actively engaged in expressing his opinions on a wide range of topics in a variety of media, including newspaper articles, letters to the editors, radio talk shows, lectures and seminars.

12. Mr. Vaksman was particularly outspoken in his criticism of the Soviet government.

13. Mr. Vaksman criticized what he considered wrong or wasteful expenditure of public funds by the University, in particular, the athletic department. He complained that the University improperly funded students who had full-time jobs and a student who was assisting the wife of the Chancellor to edit her dissertation thesis.

14. Mr. Vaksman caused a legislative inquiry to be made by the office of State Senator James "Buster" Brown into the allocation of funds by the University of Houston and specifically the History Department. Def.Exs. 58, 59. Professor Egan testified that the University administrators and History Department faculty were fearful of the information that the legislative inquiry might uncover.

15. Mr. Vaksman criticized United States sanctions on South Africa and argued in the student newspaper that sanctions should be ended because of the strategic importance of South Africa and that the choice is "Apartheid or the KGB." Pl.Ex. 31.

16. Mr. Vaksman contended that funds spent by the University of Houston Athletic Department could be better spent on academic pursuits.

17. Mr. Vaksman was critical of the failure of the University of Houston to maintain a separate graduate faculty, arguing that a

merged faculty decreased the quality of the education provided by the University to its students.

18. Mr. Vaksman was openly critical of violations of the anti-smoking policy of the University of Houston by members of the History Department.

19. Mr. Vaksman was critical of the lack of minority representation in the faculty of the University of Houston.

20. Mr. Vaksman wrote and published a book, "Ideological Struggle," dealing with Soviet internal policies which in some respects accurately presaged subsequent events in that country. The book was criticized by History Department faculty, including those within the graduate committee which expelled Mr. Vaksman.

21. The testimony of all the witnesses at trial was that Mr. Vaksman was notorious on campus for his views and that many of the views were considered embarrassing or damaging to some History Department faculty and members of the University administration.

22. The expulsion letter given to Mr. Vaksman specifically referred to his political views as "polemic" and "unteachable," and at least one member of the committee which expelled Mr. Vaksman admitted voting to oust him in part because of his statements regarding the History Department.

23. Mr. Vaksman entered and completed his first semester of enrollment in 1982.

24. By the provisions of the University of Houston Bulletin in effect at the time, "A student normally is entitled to graduate under the degree provisions of the UH Bulletin in effect at the time of the first completed semester of enrollment." Def.Ex. 90. The Bulletin provides for exceptions to this rule. None of the exceptions applies to Mr. Vaksman.

25. The University of Houston Bulletin states that "The doctoral student who fails to complete the dissertation within five years after completion of the comprehensive examination must retake the examination." Def. Ex. 90. This language is also contained in the regulations of the History Department. Pl.Ex. 5.

26. Mr. Vaksman after completing all requirements for entering the ABD stage was theoretically entitled to a minimum of five years to complete his dissertation based upon the University of Houston Bulletin, the specific notice that he received, the mutual understandings that he had formed in conversations with Hannah Decker, the graduate director for the Department of History, and the established practice of the University of Houston.

27. Professors Egan and Rothman testified that students were given a minimum of five years to complete their dissertation and that some students took 12 years or more.

28. It was reasonable for Mr. Vaksman to expect that two years after the certification of his candidacy he had three years left in which to complete his dissertation.

29. The dismissal letter labeled Mr. Vaksman as a polemicist, cast doubt upon his ability to do research in an objective manner, stated that he could not teach and was unteachable and accused him of unprofessional conduct. See Pl.Ex. 33.

30. In order to continue to pursue his academic vocation in history, plaintiff would have to make application to other doctoral programs or apply for academic employment as an ABD. In either case, he would have had to explain the circumstances of his expulsion from the University of Houston doctoral program or run the risk of assumption being made that he was expelled for some gross misconduct.

31. In either event, the declarations intentionally made, adopted and ratified by the defendants would have the effect of precluding Mr. Vaksman from pursuing his academic vocation, and they have had that effect.

32. Matters of personality and speech are not of an academic nature and are not subject to the generous consideration which might be given under other circumstances to purely academic judgments by members of a university community.

33. Mr. Vaksman was not given any prior notice of his expulsion, nor the opportunity to

respond to any concerns of the graduate committee prior to action being taken to expel him.

34. Mr. Vaksman was given an opportunity to appeal, but was not given any specific notice, and the burden was placed upon him in the appeals proceedings to prove that the action of the graduate committee was improper.

35. Mr. Vaksman was not informed of allegations of psychological instability and accusations that he was a threat to the physical safety of faculty members, charges that were placed in Mr. Vaksman's student record before he was expelled. Pl.Ex. 41.

36. Defendants utilized their positions of power over Mr. Vaksman as a student to intentionally harm him solely because of personal disagreements or grievances wholly apart from academic considerations.

37. Defendants were in a position to be particularly aware of the impact their action would have upon Mr. Vaksman. They were well aware that their action would put an end to many years of effort by Mr. Vaksman and would end any hope of an academic career for the plaintiff.

38. Mr. Vaksman applied for a student assistantship, and instead the academic department proceeded with an unannounced alleged academic dismissal without consulting Professor Egan, the principal academician in charge of Mr. Vaksman's progress. Both the proceeding and the communication of this summary dismissal of Mr. Vaksman as an unteachable polemicist was in and of itself outrageous and extreme and of a nature and character totally anathema to free academic environs.

39. The expulsion of Mr. Vaksman was well beyond the limits of societal expectations of a public institution and learned professionals.

40. Mr. Vaksman testified credibly that he was subjected to emotional distress, and the contemporaneous documented observations of some defendants corroborate such distress. Pl.Ex. 41.

41. Mr. Vaksman, an extremely intelligent, accomplished writer and student, suffered severe emotional distress when he was summarily expelled for alleged, if not fabricated, academic insufficiencies.

42. Mr. Vaksman has been unable to secure academic employment beyond that of serving as a substitute high school teacher. He attributed that situation to his inability to finish his dissertation and obtain his doctor of philosophy degree.

43. Defendants were in a position to anticipate that their actions necessarily would bar Mr. Vaksman from the benefit of prospective beneficial relations as a well-qualified expert in Soviet history and governmental affairs. Even though defendants cannot be said to have anticipated the recent events in the Soviet Union, they nevertheless well knew that on the basis of his book and professional presentations Mr. Vaksman reasonably could expect a secure academic career.

44. The Court finds actual damages in the amount of $22,500.

45. Emotional distress damages are found in the amount of $10,000.

46. Reasonable and necessary attorney's fees are found in the total amount of $90,000, prorated $35,000 to Sewell & Riggs and $55,000 to David T. Lopez & Associates.

### Conclusions of Law

1. There is no evidence or insufficient evidence to support the defendants' plea to the jurisdiction and 12 affirmative defenses.

2. The Court finds defendants violated Article 1, Section 8 of the Texas Constitution, the right to free expression.

3. The defendants violated the liberty interest of plaintiff under the First and Fourteenth Amendments of the United States Constitution.

4. The defendants violated due process of plaintiff under Article 1, Section 19 of the Texas Constitution.

5. The defendants breached their contract with plaintiff under the catalog of admission.

6. The Court finds no intentional interference with contract.

7. Attorney's fees are awardable. (See *Edgewood v. Kirby.*)

8. The Court finds no liability of the individual defendants Amos C. Miller, Stanley E. Siegel, and James A. Tinsley in their individual capacity.

9. The conduct of defendants was in their official capacities only, with the exception of James H. Jones and John Ettling.

10. Plaintiff proved the claims found by a preponderance of the evidence.

11. Plaintiff had a property interest in continued enrollment in the Ph.D. program.

12. The Court applies issue preclusions to certain claims tried in summary proceeding before the Honorable Norman Black in *Fabian Vaksman v. The Board of Trustess [Trustees] of the University of Houston, et al,* Civil Action No. H–88–2346.

13. The Court finds both factually and as a matter of law that the case of *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880 (Tex.1990), is inapplicable to plaintiff's testimony concerning attorney's fees.

14. Costs are taxed against defendants.

15. All other relief not expressly granted is denied.

16. Judgment should be rendered in favor of plaintiff.

SIGNED Oct 29, 1991.

/s/ Don Wittig
JUDGE DON E. WITTIG
125TH DISTRICT COURT

DEW:mm

HUTSON–DUNN, Justice, dissenting and concurring.

I withdraw my original opinion and issue this one in its place. I would deny the appellee's motion for rehearing, grant the appellants' motion for rehearing, and substitute this opinion for the majority's opinion. I dissent in part (points of error one, two, five, and eight) and concur in part (points of error three, four, and six, and cross-point one) from the majority's opinion.

*Points of error one and two*

Under points of error one and two, the appellants argue in part that the trial court erred in entering judgment for Vaksman because all of Vaksman's claims, except for the one regarding the first amendment, were precluded from trial in the state action by res judicata. I agree.

Res judicata, or claim preclusion, prevents the relitigation of a claim or cause of action that has been previously litigated. *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 628 (Tex.1992). Once there is a final judgment in an action, a party no longer has the right to bring suit on the transaction or series of transactions out of which the action arose. *Id.* at 631 (citing Restatement of Judgments § 24(1) (1982)).

On August 6, 1991, the judge in the federal action entered a partial final judgment, attached as Appendix A, stating that the *only remaining claim in this case is Vaksman's first amendment claim against the Board of Regents of the University of Houston, in their official capacity, as all substantive and procedural due process claims, claims of liberty interest violations, and claims against the defendants in their individual capacities were dismissed in an earlier summary judgment.* In this summary judgment, attached as Appendix B, the federal court:

1) dismissed Vaksman's federal due process claims after finding that he did not have a property interest in continued enrollment in the graduate program;

2) dismissed his claim of a contractual right to continued enrollment arising out of the University of Houston Bulletin–Graduate Studies (the catalog);

3) found that Vaksman did not have a cognizable liberty interest which had been denied by the appellants;

4) found that even if there was a sufficient interest to form the basis of a procedural due process claim, the defendants provided sufficient process;

5) found that Vaksman's substantive due process claim lacked merit in light of his failure to show that he had a property or liberty interest;

6) found that even if there was a sufficient interest to form the basis of a substantive due process claim, Vaksman failed to show that the University's dismissal constituted "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment," citing *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 513 [88 L.Ed.2d 523] (1985);

7) found that as to Vaksman's claim that his dismissal was in retaliation for the exercise of his first amendment rights, he must prove a) that the speech or conduct was constitutionally protected, and b) that it was a substantial departure or motivating factor in the adverse action taken against him, citing *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568 [50 L.Ed.2d 471] (1977). In this connection, the federal court found a) that Vaksman's speech regarding the University of Houston's policies did not address a matter of public concern, but rather addressed personal grievances that Vaksman had against the department, and b) that his speech on political topics addressed a matter of public concern and that there is a factual dispute concerning whether there is a nexus between the University of Houston's dismissal and the nature of the speech, and therefore the court refused to grant summary judgment on the first amendment claims *against the Board of Regents of the University of Houston in their official capacity only;* and

8) found that the defendants who were sued in their individual capacities are protected from suit by the doctrine of qualified immunity.

In conclusion, the federal district court granted summary judgment of all claims in favor of the University of Houston except Vaksman's first amendment claim against the University of Houston's Board of Regents as described above in 7).

On August 30, 1991, Vaksman gave notice of appeal, pro se, from the summary judgment and partial final judgment as described in the attached Appendix C. The Fifth Circuit affirmed. While this appeal was pending, the state case now on appeal to this court was tried, beginning on October 8, 1991.

In the state action, Vaksman plead due process violations under the Texas Constitution, free speech violations under the Texas Constitution, breach of contract, intentional and negligent infliction of emotional distress, and tortious interference with existing and prospective contractual rights, these last two not being pled in the federal action. First and fourteenth amendment violations under the Federal Constitution were also presented to the trial court and tried by consent.

In the state action, on appeal here, the trial judge stated in the findings of fact and conclusions of law and in the final judgment that he was taking judicial notice of the federal court orders and that he would not relitigate those issues that had already been dismissed in the federal court. Nevertheless, for some reason not clear from the record, the trial judge made findings on all causes of action before him.

The first action was tried in federal court. Therefore, this Court must use federal law in determining whether res judicata will bar any of the state proceedings here. *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 718 (Tex.1990) (citing *Aerojet–General Corp. v. Askew*, 511 F.2d 710, 715 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975)). Under federal law, res judicata will apply if: 1) the parties are identical in both suits; 2) the prior judgment is rendered by a court of competent jurisdiction; 3) there is a final judgment on the merits; and 4) the same cause of action is involved in both cases. *Eagle Properties*, 807 S.W.2d at 718 (citing *Nilsen v. City of Moss Point*, 701 F.2d 556, 559 (5th Cir. 1983)). Generally, when a cause of action is brought in federal court and both federal and state claims could be asserted there, and only federal claims are advanced, a plaintiff may not later bring the state claims in state court. *Eagle Properties*, 807 S.W.2d at 718. Res judicata will not bar these claims in state court if the federal court did not possess jurisdiction over the state claims or would clearly have declined to exercise jurisdiction as a matter of discretion. *Id.*

This Court may take judicial notice of the federal court orders on its own motion. *Langdale v. Villamil,* 813 S.W.2d 187, 189–90 (Tex.App.—Houston [14th Dist.] 1991, no writ); TEX.R.CIV.EVID. 201. Before the state suit went to judgment on October 17, 1991, the federal court entered the partial final judgment on August 6, 1991, described above and attached here as Appendix A. Therefore, I would hold that Vaksman was precluded from relitigating the breach of contract claims and state and federal due process claims by res judicata, as these claims were previously litigated in the federal court.[1]

I would sustain points of error one and two and reverse the judgment as to the contract claims and the due process claims. As to Vaksman's first amendment claim against the Board of Regents in their official capacity, which is not precluded by res judicata, I have addressed the appellants' arguments below.

### Point of error five

Under point of error five, the appellants argue that Professors Jones and Ettling were protected from individual liability by the doctrine of quasi-judicial immunity. I would hold that this issue was previously litigated in the federal court, and, therefore, the state court was barred from making another determination regarding the issue.

Collateral estoppel, or issue preclusion, bars the relitigation of issues already determined in a prior suit. *Barr,* 837 S.W.2d at 628. The factors that must be considered when determining whether an issue will be given estoppel effect are 1) whether the parties were fully heard; 2) that the court supported its decision with a reasoned opinion; and 3) that the decision was subject to appeal or was in fact reviewed on appeal. *Mower v. Boyer,* 811 S.W.2d 560, 562 (Tex.1991).

As noted above, the federal court determined that the defendants who were sued in their individual capacities were protected from suit by the doctrine of qualified immunity. I would hold that the state court was barred by collateral estoppel from relitigating this issue, because the parties were fully heard on this issue on summary judgment, the court gave a reasoned opinion, and the judgment was reviewed on appeal by the Fifth Circuit. *See Mower,* 811 S.W.2d at 562.

I would sustain point of error five.

More grounds, in addition to the ones discussed above, for sustaining points of error one, two, and five follow at various points below.

### Points of error one, two, and eight

Under points of error one, two, and eight, Vaksman claims that his substantive due process and first amendment rights were violated by his academic dismissal. "A student bears a heavy burden in persuading the courts to set aside a faculty's judgment of academic performance." *Mauriello v. University of Medicine & Dentistry,* 781 F.2d 46, 51 (3rd Cir.1986). A school's decision to dismiss a student based on academic grounds may only be overturned by a court "if there was no rational basis for the university's decision, or if the decision was motivated by bad faith or ill will unrelated to academic performance." *Ikpeazu v. University of Nebraska,* 775 F.2d 250, 253 (8th Cir.1985) (citing *Hines v. Rinker,* 667 F.2d 699, 703 (8th Cir.1981)); *see Eiland v. Wolf,* 764 S.W.2d 827, 833 (Tex.App.—Houston [1st Dist.] 1989, writ denied); *Gaspar v. Bruton,* 513 F.2d 843, 851 (10th Cir.1975); *Wilkenfield v. Powell,* 577 F.Supp. 579, 583 (W.D.Tex.1983).

Vaksman maintains that his academic dismissal was motivated by bad faith. When a student attacks his academic dismissal as—

---

1. The majority disingenuously states that the documents that constitute appendices A, B, and C are not in the record. These documents are referred to in the appendix to the majority opinion, in conclusion of law number 12, wherein the trial judge wrote: "The Court applies issue preclusions [sic] to certain claims tried in summary proceeding before the Honorable Norman Black in *Fabian Vaksman v. The Board of Trustess [sic] of the University of Houston, et al.,* Civil Action No. H–88–2346." Obviously, the trial judge could not have applied issue preclusion, i.e., collateral estoppel, if the claims tried in Judge Black's court had not been disposed of by a final judgment, and the trial judge had not seen that final judgment. It is the very documents that make up appendices A, B, and C that comprise the final judgment on those claims. Under *Langdale,* 813 S.W.2d at 189–90, a court may take judicial notice of such documents, and I have done so.

serting that the dismissal was motivated by other than his academic record, the evidence of bad faith must be compelling and not merely surmise, conjecture, speculation, or tenuous inferences, in order to overturn the school's decision to dismiss. *Gaspar*, 513 F.2d at 851; *see Levi v. University of Texas*, 840 F.2d 277, 281 (5th Cir.1988); *Greenhill v. Bailey*, 519 F.2d 5, 10 n. 12 (8th Cir.1975); *Duke v. North Texas State Univ.*, 469 F.2d 829, 834 (5th Cir.1973). In my opinion, the "evidence" of bad faith in this case is nothing more than speculation and flimsy circumstantial evidence, and is not of such a compelling nature that the decision to dismiss Vaksman should be overturned.

In order to determine the underlying motivation of the graduate committee's decision to dismiss, under the applicable standard of review, this Court should first examine Vaksman's academic record, giving great deference to the faculty's professional judgment, *Clements v. County of Nassau*, 835 F.2d 1000, 1005 (2d Cir.1987), to determine if there is a rational basis for the committee's decision. Following such review, we should then address whether the evidence demonstrates that the committee's decision was motivated by bad faith.

The following are excerpts from documents contained in Vaksman's academic record, beginning in 1982 when he entered the University of Houston's doctoral program, and continuing to October 26, 1986, which the graduate committee had before it in making the decision to dismiss Vaksman:

**Progress Report—Fall, 1982**

**Class Performance (written and oral)**

**Professor Roider**

 ... *Fabian began working with me based on the understanding that he had a solid background in the literature of Soviet–American relations since 1917 ... supposed to turn out a paper on US–USSR relations and the Middle–East ... I found ... Fabian's understanding and background in US diplomatic history extremely limited, he was also not reading or utilizing many of the books....*

 ... *I found Fabian's performance inadequate this semester.... showed very little*

*evidence that he was familiar with the literature on Soviet–American relations....*

 ... *[He] is most dogmatic in his views and cannot accept either scholarly criticism or logical arguments gracefully....*

 ... *I do not wish to damn Fabian without giving him a chance to prove himself in other ways and with other professors.... recommend he look into becoming a graduate student in political science, since much of his dogmatic approach may fit into studies in political philosophy....*

**Student evaluation. Academic year: 1982–83**

**April 19, 1983. Graduate Committee History Department.**

 ... *after a year at UH, the faculty who have had contact with him [Vaksman] find that his mind is set and that he listens and follows instructions poorly.... in order to succeed he needs a fundamental change of attitude towards the study of history, especially a willingness to listen to suggestions that will improve his work.*

**From: Edwin A. Mills—History Dept.**

**May 12, 1983**

 ... *got off to a very rocky start in the seminar. After initially indicating that he wanted to do a paper on U.S. policy and the Yom Kippur War, abruptly switched to a topic relating to the debate over psychohistory, and then a month later he decided to work on the Nixon administration's policy regarding importation of foreign oil. (When he made this second switch, I thought about getting him to drop the course, but I did not do so.)*

 ... *a few weeks later he agreed to read a paper at a student conference ... and asked me to read and criticize his manuscript, which I found totally unacceptable. He ... just barely touched the surface in his research and it was obvious he had a preconceived notion of what he was going to prove and although he found nothing to substantiate his theory, he stubbornly held on to it. I insisted he consult primary*

sources ... he at first argued that this was not necessary ("What do you mean, I haven't done enough research? I did enough to write fourteen pages.") After a couple of shouting matches—the first I have ever engaged in with a student—he reluctantly agreed to do so when I said that otherwise I would seek to secure his withdrawal from the course.

## Progress Report—Spring 1983

### From: J.K. Martin, March 21, 1983

*Class Performance or doctoral dissertation progress:*

*[Vaksman] ... certainly is willing to talk in class, although his comments are difficult to follow.... His first historiographical essay for History 6355 had a rambling, inchoate quality.... I am not really sure what the essay was all about.... [Vaksman] will have to become more disciplined—and needs to develop the art of listening, which currently is not one of his strengths.*

## Progress Report—Spring 1983

### From: Hannah S. Decker, Department of History

*... [Vaksman] can be stubborn and rigidly opinionated, and unaware of the effect this has on others.... a tendency to pursue his own line of thinking in class even if it is clearly separate from the topic under discussion. He seems not to be able to learn or follow instructions if he is convinced that his way of approaching an assignment is the correct way.*

## Evaluation of Fabian Vaksman, December 16, 1983

### From: Hannah Decker, Department of History

*... [Vaksman] tried to be cooperative in his own peculiar way, but it was often difficult for him to understand how I wanted things done and I had to resort frequently to authoritative commands rather than friendly advice. He has set ideas about certain functions, and it is hard to dissuade him.*

*[When Vaksman handled discussion groups] ... [t]he student reaction was not enthusiastic partly because he is difficult to understand partly because he is inexperienced and talks over their heads.... he was sensitive to criticism and became defensive rather than seeking to profit from it.*

**To: Dr. Curry**

**From: Hannah S. Decker**

**March 6, 1984**

**Re: Evaluation of Graduate Assistant**

*Mr. Vaksman is an excellent TA [teaching assistant] in some areas, but a very troublesome one for me in others.... In some ways he is reliable, but in others he seems not to be. My major complaint is that Mr. Vaksman seems to be unwilling to teach my course the way I want it taught.... He seems to be using different standards than the ones I gave him (and gave the students in writing) to grade the exam papers. He seems to be using the discussion group meetings more as supplementary lecture sessions at which he teaches material I failed to cover in my lectures.... He has told students that he will not have them continue in his class because they have missed three sessions; My rules state that a student will be dropped after the fourth absence but not before. He insists that is too lenient. I expect him to follow my instructions while he is working for me ... and it seems to me that he cannot do so without some resistance.*

*I have had to transfer five students out of his discussion groups based on their inability to learn anything from him in the discussion groups or find out from him what they were doing incorrectly on their examinations.*

*.... [I]n my opinion, Decker's specific problems with Vaksman ... clearly add up to a negative recommendation from me for Mr. Vaksman. I believe that it will be difficult, if not impossible, for him to work as a teaching assistant with (or for) anyone who does not structure the class exact-*

ly as Mr. Vaksman would have it structured.... I believe I must give him [low marks] ... for willingness to learn, flexibility, and effectiveness ...

I cannot in good conscience recommend that he continue as a teaching fellow/assistant. I do not want to have him work with me again.

To: Professor Hannah S. Decker

From: Victor L. Mote,

Codirector of Vaksman's doctoral dissertation

Date: March 26, 1984

Re: Fabian Vaksman

I have just now finished a careful reading of Mr. Vaksman's paper entitled "Political Structure and Politics in the USSR: The Cause of Paranoia and Rationality" and am troubled by it for a number of reasons.

... I perceive far greater deficiencies in his use of written English.... His paper will require almost a total rewrite.... I have not been able to pore over more than the first three pages of the latter work, and even that small amount of reading has been accomplished with excessive difficultly.... I'm not sure whose English the dissertation would be written in the final draft, Fabian's or mine. And if it were mine, how fair would it be to future potential employers of Fabian ... His problems lie very apparently with the written word.... he must not be rushed through the Ph.D. experience, simply because he has impressed someone with the spoken word.... even I have been duped.

... I feel very uneasy about the subject matter that Fabian purports to be exploring.... as a psycho-historian you would be capable of analyzing [the material] ... but this is as far afield of my basic interest as Martian geography.

... I don't know the literature on this subject very well, but it seems to me that if Fabian is going to expect to study such issues as the "cause of paranoia and rationality," where is his literature on psycho-history?

... it has come to my attention that Fabian has not taken any coursework in American foreign policy ... It would seem to me to be unprofessional on all of our parts if we were to even consider him as an expert on such a topic without such courses. I don't question his ability to judge the foreign policies of his former countrymen.... but since his is a dissertation on aspects of American History I would strongly recommend further appropriate coursework.

Lastly ... [he needs to master written English].... [needs to become knowledgeable] in American and comparative foreign policy.

... If Fabian does not agree to these terms, then he must be asked to consider another topic for his dissertation.... I cannot serve as co-chair of his committee under the current set of circumstances.

I'm sorry if this has caught you off guard. I have had to be sincere and direct in order to alert you to the gravity of this matter....

cc: Prof. Stanley Siegel
 Prof. Edwin Miles

Inter–Office Memorandum—April 30, 1984

From: S. Siegel

To: Prof. H. Decker

Re: Fabian Vaksman

The committee (Profs. Haynes, Mintz, Swenson, and Siegel) appointed to supervise Mr. Vaksman's Ph.D. oral examination awarded him a "marginal pass." Prof. Haynes wished to be recorded as voting against the committee's decision.

Inter–Office Memorandum—May 4, 1984

From: S. Siegel

To: Prof. H. Decker

Re: F. Vaksman

Mr. Vaksman's Ph.D. oral examining committee (Profs. Siegel, Haynes, Swenson, and Mintz) expressed some concern about Mr. Vaksman's writing style. It

was the committee's belief that more work was needed in that area.

## Progress Report on Fabian Vaksman

### Spring, 1984

### Class Performance (written and oral):

*Fabian Vaksman was probably one of the more intelligent members of the European Historiography graduate seminar; at the same time, he gave me far more trouble than any other member of the class. His performance in seminar situations was rather uneven; at times he would offer genuinely incisive observations upon the assigned readings but for the most part he was either silent or digressive and obscure in his comments. His paper was barely if at all adequate, for in the course of over three months he seemed unable or unwilling to comprehend fully what writing an historiographical paper entailed.*

*... undoubtedly intelligent and enterprising but also as ideological and inflexible in the basic working of his mind. This apparent paradox may in part—must in part—reflect his intellectual training in the Soviet Union; it may also mirror purely temperamental and/or psychological problems. Vaksman barely escaped from the course ... to be perfectly candid, I am not certain that he merited ... [the grade he received].*

## Progress Report on Fabian Vaksman doctoral dissertation:

### Professor George T. Morgan, Jr.

### Spring, 1984

### Class Performance (written and oral):

*I consider Fabian to be a marginal candidate at best. He knows very little American history; worse, he is not inclined to learn because he thinks he already knows it all.*

### Evaluation for 1983–84:

### Department of History [memo directed to Vaksman dated May 15, 1984]

*If you wish to discuss this evaluation, members of the Graduate Committee will be glad to meet with you.* .

*Most members of the faculty ... find you intelligent and commendably enthusiastic. But all find you to be a difficult person, not yet very well informed about either American or European History, highly opinionated, and maddeningly insistent on doing things your own way. Apparently you are not willing to take the most routine and straightforward instructions without an extended discussion. Often, it appears, you dispute relatively unimportant points until your professors are weary. You seem bent on developing not only a mastery of the material you study but also your own original interpretations. But your professors fear that your approach is so "ideological," so "Know it all," so dogmatic and inflexible that you will end up advancing interpretations that are based on theory rather than reality and historical evidence, and that will reflect theoretical supposition rather than a mature historical grasp of the relevant background.*

*... all reports also indicate that you must modify your approach to history, and to American historians if you are to make much of a start in the profession....*

## Progress Report—May 17, 1984—H.S. Decker

*You still have a writing problem, especially with organization i.e. the order in which you present your ideas.*

### May 21, 1984

### To: Fabian Vaksman

### From: Hannah S. Decker, Associate Professor

### Director, Graduate Studies

*Your orals committee has awarded you a grade of "Low Pass." ... Concern was expressed about your writing ability ... that before you turn to the final writing stage your writing of scholarly English needs to be improved. I strongly suggest*

*that you register for English 3340 (Advanced Composition) as one way of addressing the committee's concern.*

*It is University Park policy that you must complete dissertation within five years of the date of passing your comprehensive examination or else you must retake the comprehensive exam.... by April 30, 1989.*

cc: *Prof. S.W. Siegel*

 *E.A. Miles*

**APRIL 11, 1985**

**To: Fabian Vaksman**

**From: Steven Mintz, Assistant Professor**

 **of History**

 *... I thought it would be best if I put into writing the points that we talked about. We agreed that I would serve as advisor of your dissertation on the following conditions:*

 *... that the dissertation be a historical study, not a study in philosophy or literary criticism or a polemic.*

 *... that we will schedule meetings only when we can discuss completed chapters; meetings will not be held simply to sound out ideas;*

 *... that we will meet next to go over a completed bibliography and prospectus for your dissertation.*

 *... you will write a detailed calendar....*

**May 1, 1985**

**To: Hannah Decker**

**From: Gerald J. Goodwin, History Dept.**

 *... Evaluation of Mr. Vaksman's performance during the Fall of 1982.*

 *Mr. Vaksman was the most unsatisfactory teaching assistant I have ever had during nineteen years of teaching. Although many graduate teaching assistants are defective in their knowledge of United States history, they compensate for this by following the advice and directions provided by the faculty member with whom they teach. Mr. Vaksman did not follow the instructions I provided in weekly meetings with him and my other teaching assistants. Indeed Mr. Vaksman seemed incapable of following them if, indeed, he even understood them. He possessed a limited amount of information about United States history and an impressive mental rigidity which prevented him from adapting to the ideas developed in my course and the pedagogical techniques employed. Each week I would clearly and firmly tell my teaching assistants what I wanted them to do in the upcoming discussion group meetings they were to lead. And the next week Mr. Vaksman would breezily describe some other (and irrelevant) discussion group topic he had undertaken on his own. His defect is, I believe, an unusual form of intellectual rigor mortis.... I also refused to accept him ever again as a teaching assistant.*

September 16, 1983

To: James H. Pickering, Dean

 College of Humanities and Fine Arts

From: Robert L. Heath

 Chair, Committee to Review Case

 of Fabian Vaksman

Subject: Fabian Vaksman Appeal

 *After reviewing the facts in Mr. Vaksman's case, the committee finds ... "marginal pass" on his oral examination. Negative comments by the mentors ... Negative student comments supported the criticisms of his mentors, even though other students complimented his teaching.*

In deciding to dismiss Vaksman, the graduate committee focused on Vaksman's progress towards his doctorate, which included his progress towards his dissertation, his ability to teach, and his ability to accept faculty evaluation of his work. The record shows that there were problems in all of these areas from the time Vaksman entered the University in 1982.

Vaksman testified that he entered the University of Houston to receive a doctorate in American history, which was the only area of history in which the school offered a doctoral

degree at the time. In 1986, two years after his oral examinations, he wanted to change the basis of his doctorate from American to European history. He wanted to begin again with an oral examination in European history in order to present his ideological study, which focused on Russian history, as his dissertation. Professor Egan's testimony, as well as the evidence set out above, shows that Vaksman changed dissertation topics several times and was involved with at least four different professors as directors or possible directors of his dissertation, those being Seigel, Mote, Egan, and Mintz.

The record shows that Professor Siegel resigned as Vaksman's dissertation advisor, although there is no evidence about his reason. Professor Mote stated that he could not co-chair Vaksman's committee for several reasons. He felt that Vaksman's paper would require a total rewrite because Vaksman was deficient in his use of written English, so much so that he felt the final work product would not be Vaksman's own. Professor Mote felt that Vaksman was focusing on psycho-history, which Professor Mote was unfamiliar with and which Vaksman had not researched. Professor Mote also stated that Vaksman needed further coursework in American history. Professor Egan testified at trial that he told Vaksman that he could not accept Vaksman's Soviet ideological study because his (Egan's) field was not Russian history, and that Vaksman would have to find someone else to advise him. Vaksman spoke to Professor Mintz about being his dissertation advisor, and in 1985 Professor Mintz wrote to Vaksman, stating that he would only agree to work as Vaksman's dissertation advisor under a particular set of ground rules. These show that Professor Mintz was concerned that Vaksman might write a critical or philosophical study rather than a historical one, and that his progress would have to be carefully monitored. The record does not show what became of this relationship, or if Vaksman agreed to these terms. The record demonstrates that as of the date of his dismissal, Vaksman was still seeking a dissertation advisor. All of the problems that caused Vaksman to have trouble securing someone to be his advisor were before the graduate committee for its consideration.

The record demonstrates that beginning with Vaksman's first year, the History Department felt there were problems in Vaksman's writing and classroom performance. The faculty's initial evaluations demonstrated that his research was inadequate, his work was unacceptable, he needed an attitude change, he needed more discipline, and that he was stubborn and rigid. Faculty members noted that he did not follow instructions well and that he might do better in another area of study. Several professors wrote that they were unsatisfied with his teaching. They indicated that he would not follow class plans and was inflexible; one professor moved some students out of his discussion groups. There is no basis for us to question the judgment of those who wrote the above evaluations and complaints.

Vaksman was warned by History Department faculty members, in their 1983–84 evaluations, of the above problems. All of the letters and memoranda expressing opinions regarding Vaksman's ability to continue with his doctorate were before the committee when it made its determination to dismiss. Vaksman does not challenge the faculty members' evaluations of his performance.

With regard to whether Vaksman's dismissal was motivated by bad faith rather than the unsatisfactory record set out above, there is evidence that one graduate committee member, Professor Vaughn, made her determination to dismiss Vaksman based on three factors: 1) he "exhibited unprofessional conduct in public statements slanderous (and untrue) about the department of history"; 2) "in his teaching, as revealed by both student and faculty evaluations"; and 3) "in the quality of his work, which does not conform to historical standards of research." *Even if factor one can be classified as bad faith, this is the only piece of direct evidence of this type in the record.* However, even this evidence is of marginal value, because two of her reasons for dismissal were purely academic. Furthermore, contrary to the majority's opinion, I do not believe that we can conclude the other members of the committee voted to expel Vaksman for the same

reasons that Professor Vaughn did. There is no direct or compelling evidence in this record to support such a conclusion. A court can only overturn a school's decision to dismiss upon a showing of compelling evidence. *Greenhill*, 519 F.2d at 10 n. 12. The record contains evidence of the written votes of four other professors, none of which state that they voted for dismissal based on anything other than Vaksman's academic record. There is no evidence in this record to indicate that the other members of the committee, Professors Pickering, Ettling, Jones, Swenson, Miller, Seigel, and Tinsley, based their decision to dismiss on anything other than academics.

It is true that there is evidence that Professor Ettling had feelings of ill will towards Vaksman at some unascertainable point because Vaksman talked to the president of the Professional Historical Organization. Nevertheless, there is no evidence of what Vaksman said to the president that aggravated Professor Ettling, or of Ettling's specific comments. This is only tenuous evidence of bad faith.

Three professors testified on the issue of bad faith, as set out by the majority in its opinion. These were Egan, from the History Department, Coffman, from the Geography Department, and Rothman, from the English Department. Almost all of Professor Egan's testimony on bad faith was speculative, which Egan himself admitted. Evidence of this type is no basis for overturning the school's decision. *Gaspar*, 513 F.2d at 850. Professor Egan testified that he could not give a definitive answer about why Vaksman was dismissed and that he had no proof that the dismissal was for retaliatory purposes. Professors Coffman and Rothman did not meet Vaksman until after the dismissal, and Coffman admitted that he was not privy to any of the graduate committee's meetings concerning Vaksman.

Regarding Professor Rothman's testimony, cited by the majority, that students usually have five years to complete their dissertation, there were no guarantees by the University that Vaksman would have five years to finish his dissertation. The graduate rules state that a student may be dismissed at any time when he or she is not progressing satisfactorily. Although Professors Rothman and Egan testified that other students took long periods of time to choose and finish a dissertation, a comparison to other students is biased at this point, as no evidence was presented about the circumstances under which those students were allowed the extra time to finish their work.

There is only minimal evidence that personal feelings were considered in the decision to dismiss Vaksman, and this is as to only one of the eight members of the graduate committee. There must be positive evidence of bad faith, not just general or speculative assertions, in order to overturn a school's decision to dismiss on academic grounds. *Gaspar*, 513 F.2d at 851. I would hold the evidence presented in this record is not the direct, positive, and compelling evidence necessary to show that the school's decision was motivated by bad faith or ill will unrelated to academic performance. *See Ikpeazu*, 775 F.2d at 253. Vaksman's deficient and unsatisfactory academic record, which he does not question, supports this dismissal. This Court should give great deference to the faculty in reviewing their decision to dismiss. *Id.* at 254. The evidence does not permit a finding that Vaksman's dismissal was for reasons other than the quality of his academic performance.

I disagree with the majority's holding that Vaksman's "speech" was a substantial factor in the graduate committee's decision to dismiss him. *See Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. Again, the only nexus between the University's decision to dismiss Vaksman and the nature of his first amendment claims is the evidence discussed above concerning Professors Vaughn and Ettling. This is not evidence of a "motivating factor" affecting the entire committee's decision to dismiss. Therefore, I would hold that Vaksman's right to freedom of speech was not violated by the graduate committee in its decision to dismiss him from the school, because, as I have discussed above, the decision to dismiss was based on academics, and not influenced by outside activities.

I would sustain points of error one, two, and eight.

*Points of error three and four*

I agree with the majority's analysis regarding the appellants' immunity from a

money damages award in their official capacity and from a judgment based on breach of contract. Nevertheless, I disagree with the holding that Vaksman and the University of Houston have a contract under the catalog. The majority cites *University of Texas v. Babb*, 646 S.W.2d 502, 506 (Tex.App.—Houston [1st Dist.] 1982, no writ), for authority that Vaksman and the University of Houston have a contract under the University's 1982 catalog; however, this case is distinguishable.

In *Babb*, there was an express statement in the school catalog that allowed a student who began school under the terms of a certain catalog to continue through the program under the same catalog. 646 S.W.2d at 505–506. Given this statement, the student was held to have a right to rely on the catalog's terms. *Id.* at 506.

In the case before this Court, the catalog states, "[t]he university reserves the right to make changes without notice in information in any issue of the UH Bulletin as necessitated by University or legislative action." The express language negates the University's intent to be bound, which is a basic requirement for the formation of a contract. *Eiland*, 764 S.W.2d at 838. Therefore, I would hold that there was no contract between Vaksman and the University.

Despite this difference with the majority, I, too, would sustain points of error three and four.

*Point of error five*

Under point of error five, the appellants claim that Professors Jones and Ettling are protected by the doctrine of quasi-judicial immunity, so that any damages awarded to Vaksman cannot be recovered from them individually. As I have determined that Vaksman's dismissal was for academic reasons and that there is no evidence that Professors Jones or Ettling violated his first amendment or due process rights, I would hold none of the appellants liable.

Quasi-judicial immunity is an affirmative defense that protects public officials when they prove that they 1) acted within the course and scope of their office; 2) performed discretionary functions; and 3) acted in good faith. *Anderson v. Higdon*, 695 S.W.2d 320, 324 (Tex.App.—Waco 1985, writ ref'd n.r.e.) (citing *Procunier v. Navarette*,

434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978)). In addressing quasi-judicial immunity, the majority states that the professors are not entitled to their affirmative defense because they have not proven their good faith. I disagree. Just as the majority overlooked Vaksman's entire academic record in making its determination that the basis of the dismissal was bad faith, it now overlooks the entire academic record in determining that Professors Jones and Ettling did not prove good faith in order to establish their affirmative defense of quasi-judicial immunity. I believe that there is evidence contained in this record that demonstrates that Professors Jones and Ettling acted in good faith, and within the bounds of their discretionary powers, in their determination to dismiss Vaksman. Why the trial court decided to find Professors Jones and Ettling *individually* liable is a mystery to me.

Further, this defense is available to "government officials performing discretionary functions" whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The appellants could not have reasonably expected their actions to violate Vaksman's constitutional rights, because the law in the area governing academic dismissals was not clearly established at the time. Therefore, I would find that Professors Jones and Ettling were protected by quasi-judicial immunity.

I would sustain point of error five.

*Points of error six and seven and cross-point one*

Regarding point of error six and cross-point one, I agree only with the majority's ultimate resolution, which communicates that no constitutional, statutory, or contractual provision allows a recovery of attorney's fees in this case. I, too, would sustain point of error six and overrule cross-point one. I express no opinion whatsoever on the majority's analysis and disposition of point of error seven.

*Conclusion*

I would reverse the judgment of the trial court in its entirety, dissolving the order reinstating Vaksman.

APPENDIX A

In the United States District Court

for the Southern District of Texas

Houston Division

Fabian Vaksman

v.

University of Houston

Board of Regents, et al.

Civil Action No. H–88–2346

### ORDER

Came on this day for consideration Defendants' motion for entry of partial final judgment, pursuant to Rule 54(b), Fed.R.Civ.P. Having considered said motion, the Court finds it to have merit. Accordingly,

IT IS, THEREFORE, ORDERED that Defendants' motion for entry of partial judgment is hereby GRANTED and judgment is entered as set forth in the Court's Partial Final Judgment signed this date.

Signed this 1st day of August, 1991, at Houston, Texas.

/s/ Norman Black
NORMAN W. BLACK
UNITED STATES DISTRICT JUDGE

In the United States District Court

for the Southern District of Texas

Houston Division

Fabian Vaksman

v.

Board of Regents of the

University of Houston, et al.

Civil Action No. H–88–2346

### PARTIAL FINAL JUDGMENT

Pursuant to Rule 54(b), Fed.R.Civ.P., it is ORDERED, ADJUDGED and DECREED that Plaintiff's substantive and procedural due process claims, claims of liberty interest violation, and claims against Defendants in their individual capacities are dismissed for the reasons stated in this Court's order filed April 5, 1991, partially granting defendants' motion for summary judgment. The only remaining claim in this case is plaintiff's First Amendment claim against the Board of Regents of the University of Houston.

The Court makes the express determination that there is no just reason for delay of entry of judgment on the dismissed claims for the following reasons: 1) entry of judgment will not delay trial as this case is currently not set for trial, 2) the issues in this case are separable and independent since the legal and factual issues are clearly distinct from one another and separate recovery is available on each claim, 3) entry of partial judgment will prevent conflicting findings in the parties' pending state court action, and 4) an immediate appeal will benefit both parties since an appeal will insure that trial on the remaining issue will not have to be set aside on the basis of any error in the summary judgment.

The Court further finds it to be in the interest of judicial economy for these issues to be finally decided in one forum instead of dual appeals in the state and federal courts on the same legal and factual issues. The Court specifically finds that the purpose of Rule 54(b), Fed.R.Civ.P. is realized through entry of partial final judgment and finds that the prerequisites for entry of partial final judgment have been met.

Signed this 1st day of Aug., 1991, at Houston, Texas.

/s/ Norman Black
NORMAN W. BLACK
UNITED STATES DISTRICT JUDGE

APPENDIX B

In the United States District Court

for the Southern District of Texas

Houston Division

Fabian Vaksman, Plaintiff

vs.

The Board of Trustees of the

University of Houston, et al., Defendants.

Civil Action No. H–88–2346

### ORDER

In 1982, Fabian Vaksman was admitted to the University of Houston as a history PhD

candidate. Two years later, the University expelled him from its doctoral program. According to Vaksman, the University expelled him without prior notice in retaliation for exercising his right to free speech. Vaksman was outspoken on issues concerning American–Soviet relations as well as policies of the graduate program.

Vaksman filed suit against the members of his graduate committee, the Dean of the College of the Humanities and Fine Arts, and the President and Board of Regents of the University alleging that Defendants deprived Vaksman of both a property interest and a liberty interest without affording him due process of law. Vaksman also alleged that Defendants violated his First Amendment right to free speech.

Defendants allege that Vaksman was dismissed from the program for his poor teaching skills, unsatisfactory progress toward his dissertation, and unprofessional attitude. Pending before the Court are the parties' cross motions for summary judgment.

## I. Due Process Claims

### A. Property Interest.

In his complaint, Plaintiff alleges that he had a property interest in pursuing his degree at the University of Houston. In support of his argument, Plaintiff cites *University of Houston v. Sabeti*, 676 S.W.2d 685, 687–88 (Tex.App.—Houston [1st Dist.] 1984, no writ) in which the Court stated that "[a]ttendance at a state university is an interest protected by the due process clause of the fourteenth amendment." Further, Plaintiff alleges that he had a contractual right to continued enrollment arising out of the University of Houston Bulletin, Graduate Studies ("catalog") to continued enrollment in the program.

Defendants rely on *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705[, 33 L.Ed.2d 548] (1972) in support of their argument that Plaintiff must have more than an expectation in continued enrollment in order to establish a violation of due process. Plaintiff must have a legitimate claim of entitlement to continued enrollment. The issue before the Court is whether the catalog created a contractual right to continued enrollment in the history PhD program.

Texas law on the rights arising out of employee handbooks is instructive on this question. In *Reynolds Manufacturing Co. v. Mendoza*, 644 S.W.2d 536 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.), the Court held that an employee handbook cannot be an express agreement since the employer is not prevented from unilaterally amending or even totally withdrawing its handbook. Like the employee handbook, the University of Houston Bulletin, Graduate Studies, may be amended, changed, or withdrawn at any time, with or without notice by University of Houston.

In addition, even if a contract does exist, the history department is given the authority to dismiss a student for unsatisfactory progress. Defendants attach a copy of the bulletin to their motion which provides as follows:

> A satisfactory rate of progress toward the degree is required throughout the student's enrollment. A department may terminate a student's enrollment at any time if the rate of progress is not satisfactory.

For the reasons stated above, the Court finds that Plaintiff has failed to establish that he had a property interest in continued enrollment in the graduate program.

### B. Liberty Interest.

In his petition, Plaintiff alleges that the stigma of both his expulsion and of being branded an "unteachable polemicist" seriously impaired his career as an academician. According to Plaintiff, this impairment constituted a deprivation of his liberty interest. The Fifth Circuit has outlined the elements a plaintiff must show in order to establish a deprivation of liberty interest. A plaintiff must show (1) that he has been stigmatized, (2) in or as a result of the discharge process, and (3) that the stigmatization resulted from charges made public. *Kelleher v. Flawn*, 761 F.2d 1079, 1087 (5th Cir.1985) *citing Wells v. Doland*, 711 F.2d 670, 676 (5th Cir.1983).

In the case at hand, there is no evidence before the Court that Plaintiff applied to other programs to complete his PhD program. Because his standing in the community cannot be measured, Plaintiff has failed to show that he was stigmatized by the dismissal. In addition, Plaintiff has failed to show that the charges against him were made public. Defendants provide uncontroverted evidence showing that all information concerning Plaintiff's performance and dismissal was contained in his confidential student file. In *Kelleher*, the Fifth Circuit stated that "the mere presence of derogatory information in confidential files does not infringe an individual's liberty interest." Thus, Plaintiff has failed to show that Defendants deprived him of a liberty interest by stigmatizing him.

In light of Plaintiff's failure to establish the existence of either a property or a liberty interest to form the basis of his procedural due process claim, the Court finds that Defendants are entitled to judgment as a matter of law on this claim. Even if Plaintiff established the existence of such an interest, the Court finds that Defendants provided sufficient process to satisfy Constitutional requirements. The evidence before the Court reveals that the following events accompanied Plaintiff's dismissal:

On October 29, 1986, Vaksman was notified that the Committee was considering his dismissal. Prior to that time, Plaintiff had no notice of his impending dismissal. Plaintiff was not given an opportunity to appear before the Committee and show cause why he should not be dismissed. However, in April 1987, the graduate committee heard Plaintiff's appeal and voted to uphold its earlier ruling.

The Dean's office then appointed an *ad hoc* body to hear Plaintiff's appeal and to issue a recommendation to the Dean of the College of Humanities and Fine Arts. The *ad hoc* body issued a recommendation to the Dean in which it found that the history department did not act unfairly to Plaintiff. The Dean's acceptance of the recommendation was the final step in the University's appeals process.

The Court finds that given the academic nature of the dismissal and the courts' reluctance to interfere in the academic arena, the amount of due process afforded Plaintiff was sufficient under the test set out in *Roth*. Under the ruling in that case, a prior hearing is not required when a University decides to dismiss a student on academic grounds.

The Court also finds that Plaintiff's substantive due process claim lacks merit in light of Plaintiff's failure to show that he was entitled to a property or liberty interest. In addition, the Court finds that Plaintiff has failed to show that the University's dismissal constituted "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of University of Michigan v. Ewing*, [474 U.S. 214, 225], 106 S.Ct. 507, 513 [, 88 L.Ed.2d 523] (1985).

## II. Vaksman's First Amendment Claims

Plaintiff also alleges that his dismissal was in retaliation for the exercise of his First Amendment right to free speech. Plaintiff was outspoken about the policies of the graduate program, the graduate teaching program, and U.S./Soviet relations. Defendants contend that Plaintiff's speech fails to meet the test set out in *Mt. Healthy City School District v. Doyle*, 429 U.S. 274[, 97 S.Ct. 568, 50 L.Ed.2d 471] (1977). A plaintiff alleging a violation of First Amendment free speech must prove (1) that the speech or conduct was constitutionally protected and (2) that it was a substantial departure or motivating factor in the adverse action taken against him.

To decide the first prong of the test, the Court must determine whether the speech addressed a matter of public concern. *Connick v. Myers*, 461 U.S. 138[, 103 S.Ct. 1684, 75 L.Ed.2d 708] (1983). The evidence before the Court reveals that Plaintiff's speech concerning UH policies did not address a matter of public concern but rather addressed Plaintiff's personal grievances with the graduate program. Regarding his speech on political

topics, the Court finds that this speech clearly addressed a matter of public concern. Because there are factual issues in dispute concerning whether there was a nexus between the University's decision to dismiss Plaintiff and the nature of his speech, the Court finds that Defendants' motion for summary judgment should be denied on this claim.

Finally, the Court finds that those Defendants who were sued in their individual capacities are protected from suit under the doctrine of qualified immunity. In *Harlow v. Fitzgerald*, [457 U.S. 800,] 102 S.Ct. 2727[, 73 L.Ed.2d 396] (1982), the Supreme Court held that the qualified immunity defense is available to "government officials performing discretionary functions" whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Because the law regarding academic dismissals is not clearly established and thus Defendants could not reasonably have expected their actions to violate Plaintiff's constitutional rights, the Court finds that these Defendants are entitled to the protection of qualified immunity.

For the reasons stated above, it is hereby ORDERED that Plaintiff's motion for summary judgment is DENIED. It is further

ORDERED that Defendants' motion for summary judgment is GRANTED as to all claims except Plaintiff's First Amendment claim against the Board of Trustees of the University of Houston. Those Defendants who were sued in their individual capacities are immune from suit. It is further

ORDERED that this case is set for trial on May 20, 1991 at 9:30 a.m. in Courtroom 11B.

Signed this 4th day of April, 1991 at Houston, Texas.

/s/ Norman Black
NORMAN W. BLACK
UNITED STATES DISTRICT JUDGE

## APPENDIX C

In the United States District Court

for the Southern District of Texas

Houston Division

Fabian Vaksman, Plaintiff,

vs.

The Members of the Board of Regents of the University of Houston in Their Official Capacity, Defendants.

Civil Action No. H–88–2346

### *ORDER*

Plaintiff originally filed this action on July 8, 1988 challenging his removal from the Doctoral Program at the University of Houston. By order entered April 5, 1991, Defendants' Motion for Summary Judgment was granted as to all claims except Plaintiff's First Amendment claim against the Members of the Board of Regents in their official capacity. On August 6, 1991, the partial summary judgment was made final and appealable and the First Amendment claim against the board members in their official capacity remained pending before the Court. On August 30, 1991, Plaintiff noticed his appeal from the April 5 ruling and the August 6 order.

While the appeal was pending, a companion state court lawsuit was tried. In the State Court action, the State Court found in favor of Plaintiff on his First Amendment claim and ordered Defendants to reinstate Plaintiff by November 14, 1991, to pay damages of $32,500, and to pay Plaintiff's attorneys fees of $90,000. On March 31, 1992, the Court entered an order dismissing the remaining First Amendment claim as moot and entered final judgment. A copy of the State Court judgment, granting Plaintiff the relief to which he would be entitled in the federal court action, was attached to this Court's March 31 order. Plaintiff filed a motion for new trial in this Court seeking reinstatement of the First Amendment claim, which was denied on June 24, 1992. Plaintiff did not file a notice of appeal from the March 31 judgment or the June 24 denial of his motion for new trial.

The United States Court of Appeals for the Fifth Circuit affirmed this Court's entry of partial summary judgment in favor of Defendants and noted that the orders on appeal did not dismiss the First Amendment claim. Plaintiff, who prosecuted the appeal *pro se*, filed a motion for rehearing advising the Fifth Circuit for the first time that the First Amendment claim had subsequently been dismissed. The motion for rehearing was denied.

Because the dismissal of the First Amendment claim was not appealed, this Court no longer has jurisdiction to consider it. A timely notice of appeal must be filed before the Fifth Circuit will consider an issue on appeal, and the law in the Fifth Circuit is clear that the filing of a brief cannot substitute for a notice of appeal. *United States v. Cooper*, 876 F.2d 1192, 1196 (5th Cir.1989). The Fifth Circuit opinion cannot be construed as a ruling on any issue other than those which were before it pursuant to the notice of appeal filed in August 1991. The entry of partial summary judgment on all claims except the First Amendment claim was affirmed by the Fifth Circuit, and the dismissal of the First Amendment claim was not appealed and is now final and unappealable. As a result, this Court does not have jurisdiction to consider that claim and the order reinstating the case and setting the matter for trial was inappropriately issued and should be vacated.

Based on the foregoing, it is hereby

ORDERED that Defendants' Motion to Dismiss (Entry # 114) is **GRANTED** and it is further

ORDERED that the order of this Court issued March 2, 1993 is **VACATED.**

SIGNED this 31st day of March, 1993, at Houston, Texas.

/s/ Norman Black
NORMAN W. BLACK
CHIEF JUDGE