**Opinion issued December 31, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00867-CV

———————————

### IVAN VILLARREAL, Appellant

### V.

### TEXAS SOUTHERN UNIVERSITY; DANNYE HOLLEY, IN HIS INDIVIDUAL & OFFICIAL CAPACITIES; EDWARD MALDONADO (A/K/A SPEARIT), IN HIS INDIVIDUAL & OFFICIAL CAPACITIES; GABRIEL AITSEBAOMO, IN HIS INDIVIDUAL & OFFICIAL CAPACITIES, Appellees

---

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-64945**

---

## O P I N I O N

Former law student Ivan Villarreal appeals from a trial court order dismissing with prejudice his claims against Texas Southern University and three

members of its faculty. Villarreal argues that the trial court improperly granted a plea to the jurisdiction on his constitutional claims, his breach-of-contract claim, and his claims directed at the university employees in their official and personal capacities. We conclude that under governing precedents, Villarreal has alleged viable constitutional claims, and we reverse the trial court's judgment in part and remand for further proceedings.

## Background

As required by the standard of review applicable to this appeal, we construe the pleadings liberally and accept factual allegations as true unless proved otherwise by undisputed evidence.[1]

Appellant Ivan Villarreal enrolled in the Thurgood Marshall School of Law at Texas Southern University as a first-year student in August 2014. The university divided all first-year students into four sections. Villarreal was in Section 4. All but one of the first-year classes were graded on a curve. For those classes subject to a curve, a student's final grade was made up of two parts. The first part was an exam score that was scaled against all other first-year student scores in all sections; the second was a score assigned by the professor that was scaled against other student scores in the same section. Each of those scores accounted for half of each

---

[1] *See Tex. Dep't. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004).

2

student's grade. The students' total scores in each class were once again curved to produce final grades. Using a typical system of grade-point averages, the university had a policy of dismissing any student who failed to maintain a GPA of 2.0 (a C average) after the completion of the first two semesters.

The university had another policy prohibiting professors from leading classroom teaching sessions during the reading period between the last day of classes and final exams. Professor Maldonado, the criminal-law professor for Section 2 who uses the "professional name" of "SpearIt," proposed review sessions during the reading period. But Assistant Dean Gabriel Aitsebaomo instructed Professor Maldonado not to conduct classroom-style teaching, on or off campus, during the reading period.

Professor Maldonado held review sessions anyway. The times and locations were disseminated by email. At the review sessions, Professor Maldonado showed students at least thirteen questions that were materially identical to questions that later appeared on the sixty-question uniform criminal-law exam that was used for all four sections of students. Some students left the review sessions with copies of the previewed questions.

Shortly after first-semester grades were posted, rumors circulated among the first-year class that "a handful of students," predominantly from Professor Maldonado's Section 2 criminal-law class, had received pre-exam access to a

number of exam questions during off-campus study sessions. By early February 2015, university administrators were aware of Professor Maldonado's unauthorized review sessions. Dean Dannye Holley identified thirteen exam questions that were accessed by an undetermined number of students before the exam and commissioned a statistical analyst to determine the effect of Professor Maldonado's review sessions. The statistician sought clarification that the university administrators were "quite sure" that the thirteen identified questions were the "only items that might have been compromised," as he planned to "use the non-compromised items as the 'control'" for his analysis. Dean Aitsebaomo responded: "There is a likelihood that the other items may potentially be compromised but the items you have are the ones we were provided evidential proof of." The statistician was instructed to assume that only thirteen questions were compromised and that Section 2 was the only section that received prior access to the questions.

In early March, Dean Holley informed the entire first-year class by email that the matter had been investigated and the exam results had been submitted to a "national expert," whose "key finding" was:

> Most importantly, the overall mean difference between the alleged compromised items(13)[C] and the Non-compromised items(4)[NC] in Fall 2013 students was to be no different from the one observed in 2014. Further a comparison of the NC TO C item set performance difference between sections again showed no significant difference

between sections. This finding confirms that the differences between sections are most likely random occurrences.

Dean Holley thus stated:

> Hence our expert concluded no section received an advantage that made a difference in the performance between sections. The section which performed better on the thirteen items also performed better on the remaining 47, and the section which performed worst on the thirteen items also performed worst on the remaining 47. We must conclude therefore that even if the C items were previewed to a section, they did not impact the exam outcomes for those students, or the students in other sections[.]

The university advised students to file individual petitions with the Academic Standards Committee to review their individual exam scores by March 15, 2015, if they wished to preserve challenges to their grades. Villarreal relied on this email's conclusion that the review sessions had no effect on student scores in deciding not to challenge the C+ grade he received in criminal law.

Still concerned about the "optics" of the scenario, the university implemented a "class-wide remedy." The exam was re-scored without the thirteen compromised questions. The university then allowed students the option of accepting the new score if it was higher than the original score. The university claimed that this remedy did not result in any student's final letter grade being reduced, but in a later email to the entire first-year class, the class president stated that "at least one student's grade was lowered."

At the end of the second semester, the law school's registrar emailed Villarreal and informed him that he was being dismissed from the law school. His GPA was 1.98, below the minimum 2.0 GPA. Villarreal filed three petitions with the Academic Standards Committee, requesting review of his grades. He met with the committee, Dean Aitsebaomo, and Dean Holley. All stated that Villarreal missed the opportunity to challenge his criminal-law grade, with the committee noting that the university already "addressed administratively the issue of the alleged cheating in Criminal Law." Villarreal was then dismissed from the law school.

Villarreal sued the university, Dean Holley, Professor Maldonado, and Dean Aitsebaomo. He alleged that his substantive and procedural "due course of law" rights under the Texas Constitution were violated in multiple ways: by the unauthorized review sessions; by the university's failure to provide "suitable and appropriate remediation of the gross violation of his rights" with respect to the criminal-law exam and the determination of his cumulative GPA; by the university's actions misrepresenting the statistician's conclusions, withholding his full report, and "covering up the affair"; and by his dismissal from law school. He also alleged breach of contract. Villarreal's petition specifically stated it was "based solely on claims arising under Texas law" and that he "expressly disavows any federal claims."

While discovery was ongoing, the appellees filed a plea to the jurisdiction based on sovereign immunity and supported by evidence challenging some of Villareal's factual allegations. Villarreal filed a response, asking the trial court to deny the plea or, in the alternative, refrain from ruling until sufficient discovery could be conducted. After a hearing, the trial court granted the jurisdictional plea and dismissed Villarreal's claims with prejudice. Villarreal then filed a motion for a new trial that the trial court denied.

Villarreal appeals.

## Analysis

Villarreal contends that the trial court erred by dismissing his case. In their jurisdictional plea, the appellees argued that they were immune from suit. Sovereign immunity protects the State and its employees from suit and will defeat a trial court's subject-matter jurisdiction unless the plaintiff establishes the State's consent to suit or pleads a viable constitutional claim.[2] Subject-matter jurisdiction implicates questions of law that this court reviews de novo.[3]

---

[2]     *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

[3]     *Id*.

7

A plea to the jurisdiction may be supported by evidence challenging the existence of jurisdictional facts necessary to support a claim.[4] A trial court reviews the relevant evidence and determines whether there is a dispute regarding a jurisdictional fact.[5] When such a fact question exists, a trial court should not grant the plea, and when none exists, a trial court may rule on the jurisdictional issue as a matter of law.[6] As with a traditional motion for summary judgment, a party asserting a plea to the jurisdiction must conclusively negate a jurisdictional fact before the burden shifts to the nonmovant to present evidence raising a question of fact.[7] If a jurisdictional deficiency can be cured by allowing the nonmovant to amend his pleadings, he should be afforded that opportunity.[8]

## I. Due-course-of-law claims

Villarreal contends that the trial court improperly granted the university's plea to the jurisdiction because he stated viable due-course-of-law claims that defeated the appellees' claim to sovereign immunity. Section 19 of the Texas Bill of Rights provides: "No citizen of this State shall be deprived of life, liberty,

---

[4] *See, e.g.*, *Miranda*, 133 S.W.3d at 227.

[5] *Id.* at 227–28.

[6] *Id.*

[7] *Id.*; *Tex. S. Univ. v. Gilford*, 277 S.W.3d 65, 70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

[8] *Id.* at 226–27.

property, privileges or immunities, or in any manner disfranchised, except by the due course of law of the land."[9] The Supreme Court of Texas has looked to federal authorities applying the Fourteenth Amendment as persuasive authority when interpreting the analogous due-course-of-law clause in the Texas Constitution.[10] This court must analyze Villarreal's due-course-of-law claims and determine whether the trial court properly concluded that some element of the claims had been shown conclusively to be lacking.[11]

## A.    Procedural due-course-of-law claims

As a threshold issue for any procedural due-course-of-law claim, the claimant must allege that the state deprived him of a constitutionally protected interest.[12] Whether such a protected interest exists is a question of law this court reviews de novo.[13] The university contends that Villarreal has failed to satisfy this

---

[9]    TEX. CONST. art. I, § 19.

[10]    *See, e.g.*, *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995) ("in matters of procedural due process, we have traditionally followed contemporary federal due process interpretations of procedural due process issues"); *see also Alcorn v. Vaksman*, 877 S.W.2d 390, 396 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (en banc) ("[I]f a federal due process violation was proved, the evidence will prove a state violation, as well.").

[11]    *See Miranda*, 133 S.W.3d at 228.

[12]    *See Than*, 901 S.W.2d at 929.

[13]    *See id.* at 929–31.

element and the trial court therefore appropriately granted its plea to the jurisdiction. We disagree.

Villarreal alleged generally that the university deprived him of the liberty interest students have in "continuing graduate education." In *University of Texas Medical School at Houston v. Than*,[14] the Supreme Court of Texas has held that a graduate student dismissed for academic dishonesty held a "constitutionally protected liberty interest in his graduate education that must be afforded procedural due process."[15] And because Villarreal alleges that the appellees' handling of the exam controversy resulted in his criminal-law grade being depressed and ultimately caused his year-end GPA to dip just below the 2.0 cutoff to remain enrolled, and that he faces serious damage to his reputation and the loss of his chosen profession as a lawyer, his allegations sufficiently implicate the liberty interest in a graduate education as recognized in *Than* and precedents of this court.

The appellees contend that Villarreal's pleadings do not sufficiently allege that he was deprived of his liberty interest in continuing a graduate education without due course of law. A "flexible standard" that focuses on the "practical

---

[14]    901 S.W.2d 926 (Tex. 1995).

[15]    *Id.* at 930; *see also Alcorn*, 877 S.W.2d at 396.

10

requirements of the circumstances" applies to determine what process was due.[16] Considerations include the private interest affected by official action; the risk that the procedures used will result in an erroneous deprivation of that interest; "the probable value, if any, of additional or substitute procedural safeguards"; and "the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[17]

Villarreal claims that he was denied due process when the university acted in bad faith by misleading students about the effect of Professor Maldonado's review sessions on criminal-law exam scores. After the university informed Villarreal of its decision to dismiss him, he attempted to challenge his criminal-law grade. The university told him he missed his opportunity to challenge the grade from the previous fall semester, noting that it already "addressed administratively the issue of the alleged cheating in Criminal Law." Villarreal alleges that he did not challenge his grade earlier because he relied on Dean Holley's email sent to the entire first-year class that stated "our expert concluded no section received an advantage that made a difference in the performance between sections." Villarreal contends that the email was misleading because it quoted a portion of the

---

[16]     *Than*, 901 S.W.2d at 930.

[17]     *Id.*

statistician's report concluding that any "differences between sections are most likely random occurrences," but it left out other portions of the report that suggested otherwise, such as the conclusions that there was a "statistically significant difference" between section scores and that it was "unclear from the data available whether this difference was due to the [compromised] item set being inherently easier or the fact that student's received pre-testing information on them which would have enhanced their performance."

This court previously held that when a graduate student's dismissal results from a university's bad faith, that student's procedural due-course-of-law rights are violated. In *Alcorn v. Vaksman*, a doctoral candidate in history was dismissed for nominally academic reasons.[18] On appeal from a judgment in the student's favor after a bench trial, the university relied upon the U.S. Supreme Court's decision in *Board of Curators of University of Missouri v. Horowitz*[19] to argue that its academic judgments were due "great respect" from the court.[20] This court agreed with that principle[21] but noted that the rule "assumes, of course, that the academic

---

[18]     877 S.W.2d at 393–95.

[19]     435 U.S. 78, 98 S. Ct. 948 (1978).

[20]     *Alcorn*, 877 S.W.2d at 397.

[21]     *See id*. (citing *Clements v. Cty. of Nassau*, 835 F.2d 1000, 1005 (2nd Cir. 1987)).

decision was made in good faith," because if it was made in bad faith, the university was "not entitled to the deferential standard of review used in cases of good faith academic dismissals."[22] After reviewing the trial court's findings, this court concluded that there was sufficient evidence that the student's dismissal was not due to academic deficiencies, but instead was a result of the university's "bad faith or ill will unrelated to performance."[23]

In this case, Villarreal contends that the university engaged in a cover-up by tailoring its investigation to reach a specific conclusion. According to Villarreal, the university did this by refusing to investigate the number of students who accessed the review-session questions, by refusing to ascertain the actual number of questions that were disclosed to students in advance of the exam, by providing incomplete information to the statistician who analyzed the review sessions' effect on student scores, and finally by revealing to students only selected quotes from the statistician's report in an attempt to mislead them to conclude that the review sessions had no effect on their grades.

The university, relying on declarations of its employees, contends that its decisions to investigate the allegations, to hire an expert to evaluate the exam, and to present its findings to the first-year class are undisputed evidence that

---

[22] *Id.* (citing *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 253 (8th Cir. 1985)).

[23] *Id.* at 400 (quoting *Ikpeazu*, 775 F.2d at 253).

13

conclusively demonstrates that it did not act in bad faith. We disagree. "Bad faith, like motive and other such ultimate facts constituting state of mind, must, of necessity, usually be established as an inference flowing from words, acts and conduct proved."[24] Although "the nature of the words, acts and conduct proved might be such as to authorize and justify a court in taking a case from the jury and in drawing the ultimate fact inference as a matter of law . . . that can rarely be so."[25] The retention of a statistician and communications with the first-year class are not conclusive proof that the university did not act in bad faith.[26]

Applying our court's precedents, we conclude that Villareal adequately alleged a procedural due-course-of-law claim based on his allegation of the university's bad-faith mismanagement of an exam-grading controversy, which allegedly caused him to miss the GPA cut-off by two one-hundredths of a grade point and thereby jeopardized his reputation and intended career path.[27]

---

[24]  *Kone v. Sec. Fin. Co.*, 313 S.W.2d 281, 284 (Tex. 1958); *see also Alcorn*, 877 S.W.2d at 400.

[25]  *Kone*, 313 S.W.2d at 284; *see also Alcorn*, 877 S.W.2d at 400 (noting that where bad faith, a state of mind, is the critical issue and strong evidence exists to support the plaintiff's case, summary judgment is generally inappropriate).

[26]  *See Kone*, 313 S.W.2d at 284.

[27]  *See also Alanis v. Univ. of Tex. Health Sci. Ctr.*, 843 S.W.2d 779, 784 (Tex. App.—Houston [1st Dist.] 1992, writ denied) ("If the dismissal was based upon academic grounds, the school's decision is not to be disturbed unless it

**B.    Substantive due-course-of-law claims**

Villarreal also argues that the trial court improperly granted the plea to the jurisdiction on his substantive due-course-of-law claim. A court reviewing a student's challenge to his dismissal from a publicly funded university may not override the faculty's professional judgment with respect to an academic dismissal unless that judgment reflects such "a substantial departure from accepted academic norms as to conclusively demonstrate that the person or committee responsible did not actually exercise professional judgment."[28]

Even if we assume, as suggested by the appellees, that Villarreal's dismissal was the result of a purely academic decision, to justify deference to the decision

---

was motivated by bad faith or ill will unrelated to academic performance, or was based on arbitrary and capricious factors not reasonably related to academic criteria.").

[28]    *Alanis*, 843 S.W.2d at 789 (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 513 (1985)). Although *Ewing* made a point of characterizing the case as one involving an academic judgment, it said nothing about how and if the standard changes in disciplinary cases, *see* 474 U.S. at 225, 106 S. Ct. at 513, despite the clear difference the distinction has in procedural due-process cases. *Compare Goss v. Lopez*, 419 U.S. 565, 579, 95 S. Ct. 729, 738 (1975) (stating procedural due process requires students dismissed for disciplinary reasons be afforded "some kind of notice" and "some kind of hearing"), *with Horowitz*, 435 U.S. at 85–86, 98 S. Ct. at 953 (noting that procedural due-process requirements for an academic decision are "far less stringent," do not include a hearing, and may be satisfied by an informal process culminating in a "careful and deliberate" academic assessment).

the evidence submitted in support of the plea to the jurisdiction must conclusively demonstrate the exercise of professional judgment.[29]

Read liberally, Villarreal's pleadings allege that the "class-wide remedy" for irregularities in the criminal-law exam was arbitrary, implemented in bad faith, and negatively affected his grades. Aside from Dean Holley's declaration stating that the remedy "fit the facts," nothing in the record explains why the university imposed the remedy that it did.[30] Accordingly, we conclude that the appellees did not conclusively demonstrate that the decision to implement the "class-wide remedy" was an exercise of professional judgment entitled to judicial deference in the context of a constitutional challenge.[31] We therefore sustain Villarreal's issue challenging the dismissal of his substantive due-course-of-law claim.

---

[29] *See Ewing*, 474 U.S. at 225, 106 S. Ct. at 513; *see also Miranda*, 133 S.W.3d at 228.

[30] Although the university contends that no student's grade was lowered, that claim has been factually disputed to the extent the record includes an email sent by the class president in which he "confirmed that at least one student's grade was lowered."

[31] *See Alanis*, 843 S.W.2d at 789 ("to have a cause of action for substantive due process violations," a dismissed graduate student must show that a university official's actions "were arbitrary and capricious; that is, that there was no rational basis for the University's decision, or that the decision to dismiss was motivated by bad faith or ill will unrelated to his academic performance" (citing *Ewing*, 474 U.S. at 220–26, 106 S. Ct. at 510–14)).

## II. Breach-of-contract claim

Villarreal also challenges the dismissal of his breach-of-contract claim. He did not allege a contractual relationship with any party other than the university. By "entering into a contract, the State does not waive its immunity from suit."[32] It is "the Legislature's sole province to waive or abrogate the State's immunity from suit."[33] Therefore, even to the extent Villarreal had a contract with the university, his failure to identify any legislative authority that would overcome sovereign immunity from his breach-of-contract claim confirms that the trial court appropriately dismissed the claim. Accordingly, we overrule Villarreal's issue regarding his breach-of-contract claim.

## III. Official- and personal-capacity claims

Finally, Villarreal argues that the trial court improperly dismissed his claims against Dean Holley, Dean Aitsebaomo, and Professor Maldonado in their official and personal capacities. Every cause of action Villarreal raised against the individual defendants alleged that they violated his rights under the due-course-of-law clause. In light of our conclusion that Villarreal alleged a viable constitutional claim, we sustain his issue challenging the erroneous dismissal of his official-

---

[32] *IT-Davy*, 74 S.W.3d at 856.

[33] *Id.*

17

capacity claims.[34] Villareal's petition did not specifically allege any basis to hold the individuals liable in their personal capacities for constitutional violations, and his appellate brief sheds no additional light on the matter. We therefore overrule the challenge to the dismissal of constitutional claims against the individual defendants in their personal capacities.[35] Because Villarreal failed to state a viable personal-capacity claim against any of the named defendants, we conclude that the trial court appropriately dismissed his personal-capacity claims.

## Conclusion

We reverse the judgment of the trial court to the extent it dismissed Villareal's constitutional claims against all appellees. We affirm the judgment to the extent it dismissed claims alleging the university's breach of contract or personal liability of the individual defendants for constitutional violations. We remand the case to the trial court for further proceedings.

---

[34] *See, e.g.*, *Hall v. McRaven*, 508 S.W.3d 232, 238–39 (Tex. 2017); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009).

[35] *See, e.g.*, *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 147–49 (Tex. 1995) (no implied cause of action for damages against government employees for violations of the Texas Constitution).

## PER CURIAM

Panel consists of Justices Jennings, Higley, and Massengale.

Justice Jennings concurring in the judgment only.

Justice Massengale, concurring in the judgment.